201 N.J. Super. 453 (1985)
493 A.2d 563
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BRUCE HOLLANDER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 15, 1985.
Decided May 16, 1985.
*457 Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.
Justin P. Walder argued the cause for appellant (Walder, Sondak, Berkeley & Brogan, attorneys; Justin P. Walder, of counsel; Dominic J. Aprile and John A. Brogan, on the brief).
Jeffrey W. Coghlan, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney; Jeffrey W. Coghlan, of counsel and on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before this court on appeal from a murder conviction. The unusual circumstances of the case require that we set forth the facts leading to defendant's indictment and conviction at length.
The victim in this case was Andrea Cella who was 19 years old and was employed at the Urban National Bank in Franklin Lakes, New Jersey. On November 5, 1979 she arrived at the bank for work at approximately 7:45 a.m. Because her car was being repaired by her acquaintance Craig Farnsworth, she came in a 1975 four-door Plymouth Valiant hardtop she had borrowed from him. Andrea left the bank at approximately 5:00 p.m. and returned to her family's home three to four miles away. There she changed into jeans, a dark blue sweatshirt and hiking boots. After having dinner she left at approximately 6:30 p.m. and attended a scuba diving class from 7:00 p.m. to 9:00 p.m. After the class Andrea went to the Brownstone Inn, a neighborhood bar in Wyckoff, New Jersey. Defendant Bruce Hollander was also at the Brownstone Inn that evening, arriving *458 between 9:00 and 9:30 p.m. Defendant weighed between 200 and 230 pounds at the time. Defendant and Andrea had been good friends in high school, but apparently their relationship had cooled. Defendant, however, led a friend of his to believe that he had sexual feelings for Andrea.
Defendant and Andrea played a pinball machine in the gameroom area of the Brownstone Inn. Then Andrea left the gameroom area and went into the bar area where she sat and talked with some other friends. At approximately 11:15-11:20 p.m. Andrea called her father, informed him of her whereabouts and told him she would be home at 12:30 a.m. Shortly after midnight defendant and three male friends, Jerry DeFino, Brad Ranek and Ed Weaver, left the bar and went into the parking lot. Defendant and his friends then separated as the friends went to a diner whose operators did not permit defendant to enter. When defendant's friends left, Andrea was still in the bar and defendant headed back to that establishment. At approximately 11:30 to 11:45 p.m. Andrea told friends in the Brownstone Inn she was going home. At about midnight or shortly thereafter she was seen leaving the bar alone.
At about 5:00 a.m. Andrea's father called the Franklin Lakes police to report that Andrea had not arrived home. At approximately 5:40 a.m. Patrolman Scott Todd of the Wyckoff police department saw Farnsworth's car in the McDonald Realty parking lot across the street from the Brownstone Inn. This lot was often used by patrons of the Brownstone Inn. Todd had seen the car there earlier at approximately 12:30 a.m. and again at 2:30 a.m. Todd approached the car at approximately 5:40 a.m. and observed that the driver's side window was open, the keys were in the ignition and the passenger's side front door was unlocked. He noticed that the driver's seat was positioned far back so that there was a lot of room between the front of the seat and the dash area. He also observed a green canvas bag on the front seat of the car. Todd then went to the police headquarters for a short time but returned to the McDonald lot with Patrolman Schickfus. Todd looked through the *459 canvas bag for identification and found a wet towel and a notebook with the name "Andrea Cella" on it. Todd then rolled up the car window, removed the keys from the ignition and locked up the car. He then brought the car keys to the Wyckoff police headquarters at about 6:30 a.m. on November 6.
At approximately 9:15 p.m. on November 6 Lieutenant Karl Neubler of the Wyckoff police and Detective Bernard Kenny of the Franklin Lakes police went to the Brownstone Inn and interviewed several patrons and employees. After about 45 minutes they left the Brownstone Inn and proceeded to the McDonald Realty lot and unlocked the vehicle to examine its contents. They then decided to take the car to the Wyckoff police headquarters for safekeeping. Neubler drove the car without adjusting the seat and only touched what was necessary to operate it. The vehicle was locked at the Wyckoff police department at approximately 10:25 p.m.
On Wednesday afternoon, November 7, 1979 at approximately 3:30 p.m. Andrea's body was discovered floating near the shoreline in a private lake called Shadow Lake, located in the Shadow Lake Estates residential section of Franklin Lakes, less than three blocks from her home. The police were notified and arrived at the scene at approximately 3:42 p.m. The body was then removed from the water. The blue sweatshirt Andrea had been wearing was pulled up close to her neck exposing her breasts. Her left foot was bare. Under the sweatshirt she had on a maroon and white turtleneck. Her bluejeans were secured around her waist. While the police at first saw no blood on her, when the body was lifted from the water her head tilted and she began purging blood from her nose and mouth.
An autopsy was conducted on November 8, 1979 by Medical Examiner Dr. Marlene Lengner. Lengner determined that the time of Andrea's death was approximately between 12:30 a.m. and 3:00 a.m. on Tuesday morning November 6. The cause of death was forced asphyxiation. Lengner thought that the forced asphyxiation was done by placing something over her *460 face. The tissue over the esophagus was split. This indicated that force was used either in the stomach or lower chest where air that is usually in the stomach is forced upward. Lengner ruled out strangling and drowning as causes of death. She determined that the condition of the larynx indicated that there had been a good deal of force against it, and that edema or swelling in the larynx demonstrated that the victim had resisted the asphyxiation. Three bruises "the size of knuckles" probably caused by a blunt object prior to death were found in the head area. Lengner concluded that there were several signs of a violent struggle. The autopsy report showed that Andrea's height was 162 cm or 5'3" and her weight was 53.8 kgs. or 118 lbs. She was described as "short" and "small."
On Wednesday night November 7, after Andrea's body was discovered, Farnsworth's car was towed from the Wyckoff police headquarters to the Franklin Lakes police headquarters and processed for fingerprints. A partial left thumb print was discovered on the front seat adjustment knob which regulates the position of the seat forward or back but no other fingerprints of value were found.
The first police contact with defendant concerning the case seems to have been on Saturday, November 10, 1979. At approximately 9:00-9:30 p.m. on that day detectives Bruce Cameron and Kenny of the Franklin Lakes police department who were investigating the matter went to the Brownstone Inn where they met defendant. Cameron told defendant that they were asking the persons who had been at the Brownstone Inn on November 5 if they would voluntarily consent to having their fingerprints taken. Cameron asked defendant if he would consent to going to the Franklin Lakes police station that evening to be fingerprinted and defendant agreed. At approximately 10-10:30 p.m. defendant voluntarily went to the Franklin Lakes police station to be fingerprinted. He was given a voluntary consent agreement which he read and signed and his fingerprints were then taken. Cameron said he had trouble taking defendant's prints because defendant's fingers were *461 short and stubby and were perspiring heavily. During the course of the investigation several hundred people, including patrons of the Brownstone Inn on November 5, 1979, were fingerprinted.
Defendant agreed to return to the police station the following day for an interview. On November 11, 1979 he came in and was interviewed by Cameron and another investigator. Defendant told them that on November 5, 1979 he arrived at the Brownstone Inn in his blue Dodge Colt between 8:00 and 9:00 p.m. and met a friend in the parking lot. He then went inside and had a few drinks and played pinball. At approximately 10:00 p.m. he was playing pinball with Jerry DeFino when Andrea Cella walked in and played a game with him and DeFino. Defendant said that afterwards Andrea got up and went into the barroom. Defendant said that Andrea was wearing a sweatshirt but he could not recall her other clothing. Defendant stated that he left the Brownstone Inn at 11:00 p.m. with Brad Ranek and Jerry DeFino.
Investigators Robert Peacock and Randy Rocks, of the Bergen County Narcotics Task Force, assigned to assist the homicide squad of the Bergen County Prosecutor's office in the Andrea Cella investigation, went to the Brownstone Inn on November 14, 1979 as undercover agents. They talked to a number of people including defendant about the death of Andrea Cella. Peacock told defendant that the police had asked him what Andrea had been wearing and defendant told Peacock that he had been asked the same question. Peacock said he told defendant he didn't know and defendant looked at Peacock and said "I know better." Peacock told defendant that the newspaper said that Andrea had not been sexually abused and defendant stated "I know better" that she was. When Peacock asked defendant how he knew, defendant had no response.
Rocks had a conversation with defendant concerning Andrea's death. Defendant told Rocks that he had been talking to her and playing pinball with her at the Brownstone Inn the *462 night of the murder. Defendant further stated that "the stupid cops" didn't know what they were doing. They didn't think that she was sexually abused, "but I know different." Rocks asked defendant what else he knew and defendant didn't reply. Rocks stated that defendant stood with a half smile on his face. Defendant then said the police had half-drained Shadow Lake looking for her shoe but they would never find it.
On January 9, 1980 Cameron asked defendant if he would agree to come to the Franklin Lakes police department again to answer some other questions. Defendant agreed to the interview and went to the police station for questioning. Cameron went over the same information he had previously discussed with defendant and defendant gave him the same account of his activities on the night of November 5, 1979 as he previously had. Cameron also asked defendant about his relationship with Andrea and whether he had ever gone to bed with her. Defendant stated that on New Year's Eve 1977 there was a party at his house and a lot of people spent the night. Defendant said Andrea had slept in the same bed with him and spent the night, and that while they had "fooled around a little bit," they did not have intercourse. Defendant also said that he and Andrea had been good friends about two years before but had not "partied" since then. Defendant told Cameron that to the best of his knowledge Andrea was not seeing anyone other than her boyfriend, Richard Brown.
Obviously defendant was now a suspect in the case. The police asked him to submit to a polygraph test and on March 3, 1980 the test was given by Investigator Edward Denning of the Bergen County Prosecutor's office. Before the test defendant signed a consent form which read:
I, Bruce Hollander, voluntarily agree to take a polygraph (lie detection) examination to be given to me by Edward Denning of the Bergen County Prosecutor's Office.
I also authorize the Bergen County Prosecutor's Office to disclose, both orally and in writing, the results of this examination. I fully realize that I have the right to secure the advice of a lawyer or legal counsel before I sign this form or submit to this polygraph (lie detection) examination. I also realize that if I *463 cannot afford an attorney at this time the State will immediately secure one for me, but I waive these rights. I realize that anything I say during this examination may be held against me at a later date in a criminal proceeding. I also realize that I may remain silent and say nothing. During this examination I know that I may leave at anytime and in no way can I be forced to stay. I have no objection to taking a lie detector test, and I do so voluntarily. No one has promised me anything, threatened me, or in any way forced me to take the test. I do it of my own free will because I have nothing to hide.
During the test defendant was asked and answered questions concerning the death of Andrea. Following the test Denning wrote a report in which he concluded:
In the polygraph records there are indications of truthfulness when HOLLANDER claimed that he had no guilty knowledge of nor had he participated in the murder of ANDREA CELLA.
It is the opinion of the examiner, based upon HOLLANDER'S polygraph examination, that he is telling the truth to the above facts.
The sweatshirt Andrea had been wearing had been taken shortly after the homicide to the New Jersey State Police laboratory for examination and testing by Margaret L. Tarver, a laboratory chemist assigned to the Biochemical Evidence Unit of the State Police laboratory. Tarver filed a laboratory report dated December 21, 1979 which indicated that several bloodstains were found on the sweatshirt. One of the stains gave reactions for blood group "A" and two other stains gave reactions for blood group "AB." Blood group determinations on three other stains were inconclusive. Andrea's blood group was "A." The State Police laboratory made an analysis of pubic hair combings from Andrea and her sweatshirt and bluejeans. This test showed the presence of red synthetic fibers which did not come from her own clothing. A pair of men's blue jockey shorts found in the vicinity of Shadow Lake was also analyzed and revealed red synthetic fibers. At trial the prosecutor admitted that somebody weighing 220 pounds could not fit in a pair of shorts that size.
Obviously the initial investigation was not fruitful. But on March 2, 1982 the State received information that the defendant had admitted responsibility for Andrea's death. As a result the fingerprints taken from defendant on November 10, 1979 were *464 re-examined and on March 6, 1982 investigators concluded that the partial print found on the seat-adjustment knob matched part of defendant's left thumbprint. On March 12, 1982 Investigator Robert Rehberg of the Bergen County Prosecutor's office, Cameron and Sheriff's Officer Kaszner obtained information from the Federal Bureau of Investigation verifying the print found in the car as being from defendant. At that point the police seemed to be of the view that they had enough information to arrest defendant. But they decided not to do so until they found from defendant whether there was a rational explanation for his thumb print being in the car.
The police went to defendant's apartment on March 12, 1982 but he was not there. Clearly, however, he heard of their visit for at approximately 5:30 p.m. on that day he called the Bergen County Prosecutor's office to ask why the police were looking for him. Rehberg told him that he wanted to talk to him about the ongoing Andrea Cella homicide investigation and asked him if he would come to the prosecutor's office for an interview. Defendant said he had been interviewed on numerous occasions regarding this investigation and stated that he did not have any new or additional information but nevertheless he agreed to come to the prosecutor's office. At approximately 9.30 that evening defendant went to the prosecutor's office where he was taken to an interview room and advised of his Miranda rights by Rehberg. Although Rehberg was satisfied that he had probable cause to arrest defendant, he intentionally did not advise defendant that the police viewed him as being involved in the killing. Nor was defendant initially arrested. Cameron then joined in the meeting.
Rehberg told defendant he wanted to discuss the Andrea Cella homicide and the events in the Brownstone Inn on November 5, 1979. Rehberg stated that he reviewed two reports from prior interviews with defendant and asked defendant if he recalled being in the Brownstone Inn on November 5, 1979. Defendant said he remembered being there but did not recall the time. Defendant told Rehberg he did not see the car *465 Andrea had been operating but recalled that she normally operated a yellow Fury. He told Rehberg he last recalled seeing Andrea when she was by the pinball machine at the Brownstone Inn, stating that he left the bar at approximately 11:00 p.m. and went home. Rehberg asked defendant if subsequently to November 5, 1979 he saw the car the victim had been operating and defendant stated that a day or two after November 5, 1979 he was in a car with Jerry DeFino and Bradley Ranek when they drove past the Brownstone Inn and one of them told defendant that a car they observed in the lot was the car Andrea had been operating on the night she was killed. Defendant described the car as a very old model silver midsized car. Rehberg again asked defendant if, on the evening of November 5, 1979 or any time thereafter, he had been in the car Andrea had been operating. Rehberg stated that defendant denied ever being in the car and added that he did not learn until after the murder, through DeFino and Ranek, what type of car Andrea had been operating.
After about 20 minutes Rehberg asked defendant if he would be willing to give the same information he had just given in a sworn statement. Defendant agreed to this and thus a sworn statement was taken commencing at 9:52 p.m. and ending at 10:05 p.m. on March 12, 1982. After this statement was taken defendant theorized to Cameron and Rehberg that Andrea's death was an accident, probably the result of her resisting someone's sexual advances and that this resistance probably caused whoever she was with to panic and accidentally kill her. Rehberg stated that when he asked defendant if Andrea had ever teased him, defendant replied "Yeah" and went on to say that sometime in 1978 Andrea was at his house and while they were in his bedroom they were making out, kissing and petting on his bed. Rehberg stated that defendant told them that when he attempted to have sexual intercourse with Andrea, she resisted and got out of bed. Rehberg stated that defendant told them this happened again approximately a year later when Andrea came over to his house at approximately 2:00 to 3:00 *466 a.m. with two other girls. Rehberg said defendant told them that she woke him up after which they all went skinny dipping in his pool and after being in the pool he and Andrea went to his room and started kissing and petting. Again just as defendant attempted to have intercourse with Andrea she turned him down. Defendant told Rehberg he was frustrated and "pissed off" because Andrea refused to have sex with him. Finally Rehberg told defendant that his fingerprint had been found in the car that Andrea had been operating on Monday, November 5, 1979. Rehberg then arrested defendant for the murder of Andrea Cella.
Defendant was indicted for the murder of Andrea Cella on April 14, 1982.
There were numerous pretrial proceedings which are significant to this appeal. As we have indicated, after the homicide Tarver examined the sweatshirt Andrea had been wearing. This resulted in her filing the report indicating stains giving reactions for blood groups "A" and "AB." Quite naturally the prosecution conceived Andrea struggled with her assailant who was cut and whose blood was left upon her sweatshirt. Consequently the State obtained an order dated February 1, 1983 compelling defendant to provide a blood sample. On March 2, 1983 blood was drawn from defendant, the testing of which revealed that defendant's blood group was type "O." Subsequently, however, Tarver advised the Bergen County Prosecutor's office that in light of advances in chemical technology and knowledge, her prior conclusions identifying the blood types detected on Andrea's sweatshirt were unreliable. Tarver suspected that inasmuch as the victim's blood was from group "A," all of the stains on the sweatshirt were her blood. The indication of "AB" blood was possibly attributable to contamination.
On August 9, 1983 Tarver wrote a report that the blood stains previously reported as "AB" would now be reported as nonconclusive. Tarver further indicated that it was impossible *467 to reanalyze these inconclusive stains as they were consumed during the analysis. She also said that the area around the stain was unsuitable for analysis because of contamination. Defendant was advised of these opinions and events. This lead him to make a motion to dismiss the indictment on the ground that the State failed to preserve exculpatory evidence. This motion was denied by order of September 23, 1983.
A second matter of investigation leading to a pretrial application related to the red fibers found on Andrea's clothing and body. On or around April 5, 1982 while executing a search warrant Rehberg was able to obtain fiber samples from a red shag wall-to-wall carpeting in defendant's parent's home. There were two shades of red in the carpet, one darker than the other. Subsequently the State advised defendant that it intended to offer scientific evidence concerning "man-made," as distinguished from "natural" fibers allegedly removed from Andrea's body and clothes. The State contended that these fibers matched the fibers taken from the carpet in the basement of defendant's parents' home.
Pursuant to Evid.R. 8 a hearing was held regarding the admissibility of expert testimony concerning analysis of the fibers. The issue at the hearing was whether the scientific testing had received general acceptance in the scientific community thus permitting the evidence to be admissible at trial. At the hearing the State offered testimony from George W. Neighbor, a principal forensic chemist with the New Jersey State Police laboratory, and Dr. Richard Saferstein, chief forensic chemist for the State Police laboratory. Their testimony indicated that on the basis of fiber analysis and comparison it could be determined whether fibers and an article made of fibers could have a common source. The court gave a limited pretrial ruling concerned only with the "broad subject of the general admissibility of such tests." The judge held that the tests and procedures for the comparison and analysis of fibers were generally accepted in the scientific community. The court, however, reserved for the trial judge's determination the issues *468 of whether the specific procedure employed in the case was acceptable and whether the evidence should be rejected because its prejudicial character outweighed its probative value.
Another pretrial proceeding related to the statements defendant had given the investigators on March 12, 1982. Defendant moved to suppress these statements but this motion was denied.
At the outset of the trial the results of the polygraph examination became an issue. The prosecutor sought an order precluding defendant from commenting in the opening on the test and its results. Defendant moved for an order admitting the evidence. The judge ruled that the voluntary consent form defendant had signed did not constitute a stipulation that the results were admissible. Thus defense counsel could not refer to them.
During the course of the trial a final decision was made as to the admissibility of the fiber evidence. The trial judge ruled that the evidence was admissible. The judge decided that the State had met the burden of showing admissibility by clear and convincing evidence. He found that the study of fibers is beyond the scope of knowledge of the average layman, is a highly technical field and expert testimony would aid the jury in their search for the truth. The judge further concluded that Neighbor qualified as an expert in the study of fibers and the probative value of the evidence was not substantially outweighed by any prejudice from its admission. Thus the fiber evidence was admitted at the trial.
At the trial defendant offered a memorandum written by Rehberg, dated November 14, 1979, into evidence. The memorandum related information concerning a search of Farnsworth's car by Rehberg on November 7, 1979. Prior to this search Sergeant Ralph Snyder advised Rehberg of how the vehicle was seen unlocked on November 6 with the driver's side window down and the keys in the ignition. Snyder informed Rehberg that the keys to the vehicle had been secured by Todd *469 and another officer and brought to the Wyckoff Police Department and that the vehicle itself was later impounded and driven to the Wyckoff Police Department. Defendant asserted that the information in the memorandum related to the issue of whether the vehicle was initially locked by the police or left open during the day of November 6, 1979. If open it was accessible to persons including defendant who could have left his fingerprint on the seat-adjustment knob at that time. The court denied defendant's request to admit the Rehberg memorandum into evidence since it related information obtained from a conversation with the desk officer as to what the other officers had done.
During the trial defendant also sought to admit an affidavit of Assistant Prosecutor Calo dated July 12, 1982 under Evid.R. 63(8) and sought to cross-examine Rehberg with respect to an affidavit he executed on December 8, 1982 under Evid.R. 63(7) and (8). Both affidavits had been submitted by the State in support of its pretrial motions to compel defendant to submit to the taking of a blood sample. The affidavits referred to the original laboratory report that had determined that certain bloodstains on the victim's sweatshirt gave reactions for blood group "AB." In the affidavits the affiants stated that a sample of defendant's blood would provide the State with further evidence. The court denied defendant's request to admit the Calo affidavit inasmuch as the laboratory report upon which Calo's affidavit was based was itself admitted into evidence. The court also denied defendant's request to cross-examine Investigator Rehberg regarding his affidavit.
At the end of the State's case the use of the polygraph evidence was again raised. Defendant requested an Evid.R. 8 hearing to establish the scientific acceptability and reliability of polygraph testing. The court denied the request for the hearing. During the argument with respect to the proposed hearing the assistant prosecutor pointed out that defendant's proposal would raise collateral issues. The prosecutor said:

*470 Firstly, it is true that a polygraph was given to Mr. Hollander. But it is also true that he discussed taking the polygraph test with various persons, and at least two of those persons have indicated to the prosecution that he confessed the murder to them and that was in a sense evidence that the prosecution could have put forth on its direct case.
But there was one little wrinkle in it. There are indications that at the time he confessed the murder to them, two separate people, he indicated to them look, I did the murder. I killed Andrea Cella. But it was in the context of a conversation concerning the polygraph, and he said well, I killed her. But they want me to take a polygraph now and I'm going to go down there. I'm going to take the polygraph. I'm a little nervous about it, but I'm going to take, to take drugs to beat it. I heard you can take drugs and beat the polygraph and that's how I'm going to beat it.
Defendant's attorney responded, "... I will interrupt if we're going to start trying to play out here in a public trial evidence the State for its own reason did not introduce. I have never been given anything to indicate that there was any such confession or admission in the context which it's being presented."
Subsequently, on Sunday, October 30, 1983, during the trial, an article appeared on page 43 of the Sunday Record, a paper circulating in Bergen County, which read: "Prosecutor: Hollander confessed to 2 people." The article mentioned what the prosecutor had said during the argument. On Monday, October 31, 1983, at defendant's request, inasmuch as the jury was not sequestered the trial court questioned the jurors as to whether or not they had seen the article. Nine members of the jury indicated that the Record was delivered to their homes. Three jurors acknowledged that they had been exposed to the article and the court interviewed these jurors individually in camera. Following this inquiry the court determined that two of the jurors would be excused. Prior to leaving, both jurors were admonished by the court not to discuss the case with anyone until the jury returned its verdict. The other juror told the judge that her husband told her that there was an important article in the newspaper pertaining to the case but they had not discussed any of the material in the article.
On November 1, 1983 an article appeared in the Record indicating that the two jurors had been excused and repeating *471 the headline of the previous article. Consequently defendant requested an additional voir dire examination of each juror. The trial court acceded to the request and conducted an examination of each of the remaining 13 jurors, questioning them as to whether they had seen or heard anything about the case outside of the courtroom. At the conclusion of this examination defendant commented that he was concerned about only one of the jurors who indicated that he saw the word "Hollander" in the Sunday Record article but did not see the remainder of the headline or the article itself. This juror was excused.
At the conclusion of the evidence defendant gave the judge requests to charge in which he requested that the jury be instructed that defendant could be convicted of manslaughter. He also requested charges on the defenses of accidental homicide or misadventure. These requests were denied and the matter accordingly went to the jury solely on the murder count. While defendant submitted a request to charge that pointed out he had not testified and no adverse inference should be drawn from this, he asked the judge not to instruct the jury he chose not to testify. The judge agreed to the request but by mistake instructed the jury that defendant chose not to be a witness. Defendant objected and moved for a mistrial. While the judge recognized his error he denied the motion for a mistrial.
Defendant was found guilty of the murder of Andrea Cella. He was sentenced to 30 years' imprisonment with a 15-year period of parole ineligibility and was assessed a penalty of $2,000 for the use of the Violent Crimes Compensation Board. This appeal followed.
On this appeal defendant raises the following issues:
(1) Defendant's conviction should be reversed because the trial court erroneously refused to charge the jury with respect to manslaughter or other theories plausibly supported by the evidence. Such error denied defendant due process of law.
(2) The trial court erred by refusing to permit reference to and allow in evidence the results of the polygraph examination.
A. The trial court erroneously determined that the waiver signed by defendant was not a stipulation for the purpose of admitting polygraph evidence.

*472 B. The trial court erred by denying defendant's request for an Evid.R. 8 hearing to establish the admissibility of polygraph evidence pursuant to the standards in State v. Cavallo, 88 N.J. 508 (1982).
(3) The trial court erroneously denied defendant's motion for dismissal based upon the State's mishandling and destruction of essential exculpatory evidence.
(4) The trial court erred by admitting expert testimony relating to the analysis and comparison of fibers.
A. The trial court erred by ruling that the field of fiber analysis and comparison was sufficiently reliable to permit expert testimony regarding such analysis and comparison.
B. The trial court erred by permitting in evidence expert testimony relating to fiber analysis and comparison since the prejudicial nature of such testimony outweighed its probative value.
(5) A new trial should be granted because the court, in an admitted mistake, erred by charging the jury regarding defendant's `choice' not to testify. Such error resulted in a manifest denial of justice.
(6) Defendant was denied a fair trial due to prejudicial prosecutorial misconduct.
A. The prosecutor's improper and inflammatory summation comments denied defendant a fair trial.
B. The jury was exposed to extrinsic prejudicial information as a result of improper and inflammatory prosecutorial statements publicized in newspapers.
(7) The trial court erroneously excluded relevant and material evidence offered by defendant on crucial issues.
A. Rehberg memorandum.
B. Calo affidavit and cross-examination regarding Rehberg's affidavit.
(8) The trial court erred in its failure to suppress all evidence obtained by the State as a result of defendant's interrogation on March 12, 1982.
(9) The cumulative effect of the errors and improprieties at trial require reversal of the conviction.
Defendant contends that the trial court committed reversible error when it refused defendant's request to charge manslaughter. He argues that under State v. Powell, 84 N.J. 305 (1980) he was entitled to a manslaughter instruction inasmuch as in his view the evidence permitted a finding that the victim's death was attributable to recklessness or conduct in the heat of passion resulting from a reasonable provocation. The State submits that the trial court's refusal to instruct the jury as to manslaughter was proper for it contends there was no rational basis in the evidence for such a charge.
*473 It is clear that where there is evidence which if believed by a jury would reduce a crime to a lesser included offense than that charged in the indictment an instruction that the jury may find defendant guilty of the lesser included offense should be given. State v. Choice, 98 N.J. 295 (1985); State v. Powell, supra, 84 N.J. at 317; State v. Vujosevic, 198 N.J. Super. 435 (App.Div. 1985), certif. den. 98 N.J. ___ (1985). "A defendant in a criminal case is entitled to have the jury consider any legally recognized defense theory which has some foundation in the evidence, however tenuous.... Very slight evidence on a theory of defense will justify the giving of an instruction." State v. Powell, supra, 84 N.J. at 317 (following foreign law). Thus upon request a trial court should charge on manslaughter even though the charge is inconsistent with the defense, if a different scenario with some foundation in the evidence would reduce the homicide to manslaughter, that is, a killing in the heat of passion resulting from reasonable provocation or a killing committed recklessly. N.J.S.A. 2C:11-4.
However, the court should not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense. N.J.S.A. 2C:1-8(e); State v. Saulnier, 63 N.J. 199, 206-207 (1973). The trial judge is to decide whether a manslaughter instruction is appropriate given the facts of the particular case. State v. Powell, supra, 84 N.J. at 316. The trial judge must decide whether there is enough evidence to support the delivery of a manslaughter instruction, i.e., on the evidence could the jury find defendant guilty of manslaughter beyond a reasonable doubt? Id. at 314.
Here we conclude the evidence did not provide a rational basis to support a verdict that defendant recklessly caused the death or serious bodily injury resulting in the death of Andrea Cella nor did it support a verdict that defendant, in the heat of passion resulting from a reasonable provocation, caused the death or serious bodily injury resulting in the death of Andrea *474 Cella. N.J.S.A. 2C:11-4. Thus manslaughter should not have been charged. The evidence showed that defendant and Andrea were present at the Brownstone Inn on the night of her death. They left the bar separately around midnight. Between then and no later than 3:00 a.m., Andrea was killed. There were no known eyewitnesses to the crime other than the killer nor was it ever determined where she was murdered. The evidence showed, however, that she was forcibly suffocated, an act which required her killer to hold something by force over her mouth and nose for at least three to seven continuous minutes.
Defendant was linked to the crime by his fingerprint found in Farnsworth's car. The State introduced into evidence defendant's pretrial statement of March 12, 1982 concerning his past dating relationship with Andrea. It established that one to two years prior to the crime she had "frustrated" defendant sexually and caused him to be "pissed off" at her. Although they were nothing more than friends when she was killed there was evidence that defendant may have remained sexually attracted to Andrea. Rehberg testified that in one of defendant's pretrial statements defendant theorized that Andrea's death was an accident resulting from her resistance to someone's sexual advances, which precipitated that person to panic and accidentally kill her.
Defendant contends that this evidence provides a rational basis for a jury to convict him of manslaughter, and that the jury could have disbelieved defendant's denial of guilt but believed that defendant's theory as to the cause of death was actually an admission. Defendant argues that on this evidence the jury could have found that (1) in the course of defendant's sexual advances Andrea resisted, and defendant, with the intent merely to prevent Andrea's immediate departure, used the bulk of his weight to hold her down and she was inadvertently killed; or (2) in the heat of passion and provocation resulting from sexual frustration from being teased and/or repulsed by Andrea, defendant caused Andrea's death.
*475 While it is true that a jury could infer that defendant may have used his weight to restrain Andrea, the pathological proof presented, that the cause of death was forced asphyxiation by something over the face for at least three to seven minutes, is incompatible with a theory of reckless or accidental homicide in this case. In our view the evidence would not support a finding that by virtue of the pressure of defendant's weight alone he could have recklessly or accidentally killed Andrea by forced asphyxiation. Any inferences which can be drawn from evidence of weight disparities does not provide a rational basis sufficient to sustain a conviction for reckless manslaughter beyond a reasonable doubt.
Similarly, there was no evidence before the jury that would sustain a finding that the death was caused in the heat of passion by reasonable provocation. Certainly Andrea by declining defendant's advances did not give him provocation to kill her. There is no evidence in the case to justify a finding that Andrea so provoked defendant that when killing her he could be considered as not the master of his own understanding. State v. Wynn, 21 N.J. 264, 270 (1956); State v. Robinson, 139 N.J. Super. 475, 488 (App.Div. 1976).
Defendant's theory that Andrea may have been accidentally killed while resisting sexual advances adds nothing to his argument. It was only a theory and inasmuch as defendant did not say that this is what actually happened the statement gave no more basis for a manslaughter charge than if a police officer had developed the theory. Here if the judge had charged on manslaughter he would have improperly invited a jury verdict based on sheer speculation or compromise. See State v. Sinclair, 49 N.J. 525, 540 (1967); State v. Selby, 183 N.J. Super. 273, 280 (App.Div. 1981). Further if Andrea had been killed while defendant was using force to overcome her reluctance to sexual advances defendant would have committed a murder for she would have died as a result of his attempting to commit a sexual assault. N.J.S.A. 2C:11-3(a)(3).
*476 Defendant contends that the trial judge improperly considered the fact that defendant did not testify when he determined not to charge on manslaughter. It is true that the judge said: "My feeling is this, if there was testimony by a defense witness I would charge it but I will not charge it." But this statement did not shift any burden to defendant to present evidence. Rather this was simply the trial court's analysis of the evidence before the jury. The judge did not suggest that if evidence of manslaughter had been established on the State's case he would not have charged on the point.
Defendant contends that the trial court erred by refusing to permit reference to and allow into evidence the results of the polygraph examination taken. Defendant argues that the trial court erroneously determined that the waiver he signed prior to taking the examination did not constitute a stipulation for the purpose of admitting the polygraph evidence. He claims that the trial court's determination places form over substance and also undercuts his constitutional right to compulsory process under U.S. Const., Amend. VI and N.J. Const. (1947), Art. I, ¶ 10. He also claims that the trial court failed to evaluate subjectively what was understood by defendant. Finally on the polygraph issue defendant contends that the trial court erred in denying his request for a hearing pursuant to Evid.R. 8(1) to determine the present reliability of polygraph testing and that this violated his due process rights.
The State counters on the polygraph issue by pointing out that under State v. McDavitt, 62 N.J. 36, 46 (1972) the polygraph results were not admissible inasmuch as the form signed by defendant did not clearly stipulate that the results of the test would be admitted into evidence. The State also submits that since New Jersey's existing case law holds the polygraph test unreliable the court was warranted in denying defendant's request for an Evid.R. 8 hearing. Thus, the State contends that the trial court's refusal to permit the admission into evidence of the polygraph results or to hold an Evid.R. 8 hearing was proper.
*477 It is well established that polygraph evidence is ordinarily not admissible in criminal cases. Thus our courts have consistently rejected such evidence regardless of whether or not it is favorable to a defendant. State v. Carter, 91 N.J. 86, 116 (1982); State v. Christopher, 149 N.J. Super. 269, 274 (App.Div. 1977), certif. den. 75 N.J. 24 (1977). See State v. Melvin, 65 N.J. 1, 16 (1974); State v. Royster, 57 N.J. 472, 485-486 (1971), cert. den. 404 U.S. 910, 92 S.Ct. 235, 30 L.Ed.2d 182 (1971). However when the State and the defendant enter into a stipulation to have defendant submit to a polygraph test and have the results introduced into evidence the stipulation is enforceable and the polygraph evidence is held admissible. State v. Carter, supra, 91 N.J. at 116; State v. McDavitt, supra, 62 N.J. at 46. But the stipulation must be "clear, unequivocal and complete." We have already set forth the consent form. While the form authorizes the disclosure of the results and the use of what was said, it does not mention the use of the results as evidence. Thus we cannot read the form to be a stipulation that the results could go into evidence. We may be certain that if the results had been unfavorable to defendant he would have objected to the admissibility of the results.
Defendant contends that when a defendant rather than the State seeks to introduce polygraph results, a different perspective is appropriate. However we reject this contention. If defendant wanted to use the test results he should have insisted on a stipulation allowing their use. Further it is clear that defendant's contention that rejection of the test violates his rights for compulsory process under U.S. Const., Amend. VI and N.J. Const., Art. I, ¶ 10, is without merit. Defendant has no constitutional right to have inadmissible evidence admitted. We also reject defendant's contention that the trial court should have applied a subjective evaluation of what was understood and agreed to by defendant and in effect allow this understanding to constitute a stipulation. Clearly this approach is not workable. In any event defendant's subjective *478 intent is not germane. See State v. Powell, 98 N.J. 63 (1984), rev'g on dissent 197 N.J. Super. 191, 194 (App.Div. 1983). Finally we hold that the trial court properly declined to hold an Evid.R. 8 hearing on the reliability of polygraphs. Clearly State v. McDavitt, supra, 62 N.J. at 36, requires that the results be admitted only by stipulation. No matter how reliable polygraphs may become the results cannot be admitted without stipulation. Obviously the State could not compel a defendant to take a test. Thus involuntary polygraph evidence would be one-sided for only when a defendant agreed to a polygraph could the evidence be developed.
Defendant contends that the trial court erred in denying his motion to dismiss the indictment. The judge found that the evidence submitted by the State had been and continued to be that the tests performed gave reactions for the "AB" blood group. Tarver merely testified to the possibility of contamination which might have made the readings wrong. The judge indicated defendant was able to meet this evidence at trial with his own expert.
Defendant contends that the destruction of the evidence was tantamount to non-disclosure of exculpatory evidence and was therefore a violation of his due process rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It is of course true that a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. Brady v. Maryland, supra, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. But this privilege is not without limitation. Recently the United States Supreme Court considered the scope of the prosecution's duty to take affirmative steps to preserve evidence on behalf of criminal defendants in California v. Trombetta, ___ U.S. ___, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). There the Court held that due process does not require law enforcement agencies to preserve breath samples as a *479 condition of introduction of breath-analysis tests at a drunken driving trial. Thus the State's failure to preserve the breath samples did not constitute a violation of due process. The Court found that in failing to preserve the sample the authorities acted in good faith and in accord with their normal practice. California v. Trombetta, supra, ___ U.S. at ___, 104 S.Ct. at 2532-35, 81 L.Ed.2d at 422.
New Jersey case law together with the recent Trombetta decision reveal three factors on which a court should focus to determine whether a due process violation has occurred when there has been either suppression, loss or destruction of physical evidence in a criminal trial: (1) whether there was bad faith or connivance on the part of the government, State v. Serret, 198 N.J. Super. 21, 26 (App.Div. 1984); State v. Washington, 165 N.J. Super. 149, 155 (1979); (2) whether the evidence suppressed, lost or destroyed was sufficiently material to the defense, Trombetta, ___ U.S. at ___, 104 S.Ct. at 2534, 81 L.Ed.2d at 422; State v. Serret, supra, 198 N.J. Super. at 27; (3) whether defendant was prejudiced by the loss or destruction of the evidence, State v. Serret, supra, 198 N.J. Super. at 27; State v. Washington, 165 N.J. Super. at 155.
Here the record establishes that consumption of the blood stains occurred in good faith and in accord with the State's normal practices. The destruction of the stained portion of the sweatshirt was caused by the consecutive running of the tests. The stains were tested five-six times in order to reach conclusive results as to blood type, a procedure Tarver indicated was normal. The materials adjacent to the stains were cut out when the stains were being tested although Ms. Tarver did not recollect what happened to them. In this case there was no evidence of bad faith. See State v. Kaye, 176 N.J. Super. 484, 490 (App.Div. 1980), certif. den. 87 N.J. 316 (1981).
Further the bloodstains lacked sufficient materiality to the defense for us to find a due process violation. In order to meet the standard of constitutional materiality:

*480 [E]vidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. [California v. Trombetta, ___ U.S. at ___, 104 S.Ct. at 2534, 81 L.Ed.2d at 422]
Here the bloodstains were of no evidential value until they were identified as "reacting" for blood type "AB" which was after the stains were consumed or destroyed.
Finally we point out that the lab report was exculpatory in nature. Only Tarver's views required contradiction by defendant. Defendant could challenge her testimony with his own expert and by cross-examination.
Defendant's contention that the court erred by admitting expert testimony relating to the analysis and comparison of fibers does not require extended analysis. The State, in support of admission, proffered two witnesses, Neighbor and Saferstein. Neighbor had been a principal forensic chemist for ten years, was a chief forensic chemist for two years prior thereto and previously had been a research chemist for 20 years. The expert testimony of Neighbor and Saferstein demonstrated that on the basis of present techniques of fiber analysis and comparison, it could be determined that a fiber and an article made up of fibers could have a common source. They agreed, however, that it could not be said with certainty that an evidential fiber belongs to a particular known sample. Thus the judge's finding at the pretrial hearing that the State had established by clear and convincing evidence the scientific tests described were generally accepted in the scientific community for use in the comparison of fibers is supported in the record. See State v. Hurd, 86 N.J. 525, 546-547 (1981). Further the finding at the trial admitting the tests here is fully supported by evidence in the record.
We see no basis for a reversal by reason of the court's charge with respect to defendant's failure to testify. The judge offered to charge in accordance with a model jury charge that defendant had chosen not to testify but the jury should not *481 consider that fact in reaching its verdict. Defendant requested a slightly different charge which indicated that the fact he had not testified should not enter into the jury's deliberations. The difference was that defendant's proposed charge did not mention that it was his choice not to testify. Unfortunately the judge erroneously charged that defendant had chosen not to be a witness. Defendant then moved for a mistrial, a motion that was denied.
The court properly denied the motion for a mistrial. Certainly when defendant himself requested that the court point out he had failed to testify it cannot be said that the judge's statement that defendant chose not to testify violated any constitutional right. See Lakeside v. Oregon, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978); State v. Lynch, 177 N.J. Super. 107, 115 (App.Div. 1981), certif. den. 84 N.J. 347 (1982). We think in a criminal case that even to a jury of laymen when a defendant does not testify this failure is his own decision. It is not conceivable to us that the judge's statement could have impacted on the verdict. Thus we will not reverse on this ground. R. 2:10-2.
We see no error in the restriction by the judge of the use of the Rehberg and Calo affidavits and the Rehberg memorandum. Here defendant deemed the Rehberg memorandum material with respect to defendant's left thumb print which was found on the seat adjustment knob in the Farnsworth vehicle. The State presented evidence tending to establish that the Farnsworth vehicle had been locked and secured by Todd on early Tuesday morning, November 6, 1979. In order to suggest the possibility that defendant could have innocently left his print there sometime after the death (despite his statement that he was never in the vehicle) defendant sought to establish that the vehicle remained unlocked during the day on Tuesday, November 6. To do this defendant offered the November 14, 1979 memorandum written by Rehberg.
*482 In the memorandum Rehberg described the search he made of the car on November 7 in the course of which he recounted what had been disclosed to him by a desk officer, Snyder, prior to his search of the vehicle. Snyder advised Rehberg as to the course of events prior to impounding the vehicle. The desk officer advised Rehberg that on Tuesday morning, November 6, 1979, "Ptl. TODD and Ptl. SCHICKFUS observed that the vehicle was unlocked with the driver's side window down and the keys in the ignition. Ptl. TODD and Ptl. SCHICKFUS, checked the vehicle, removed the keys and brought them to the Wyckoff P.D." Defendant sought to introduce this to show that there was no indication that the car was locked by the officers or that they closed the window. Defendant offered this exhibit into evidence under Evid.R. 63(13) which provides:
A writing offered as a memorandum or record of acts, conditions or events is admissible to prove the facts stated therein if the writing or the record upon which it is based was made in the regular course of a business, at or about the time of the act, condition or event recorded, and if the sources of information from which it was made and the method and circumstances of its preparation were such as to justify admission. (Emphasis added.)
Here the memorandum indicates that the source of information to Rehberg was not Todd nor Schickfus but rather was the desk officer, Snyder. We do not know the source of Snyder's knowledge nor did the trial judge. Thus we cannot say he erred in his finding there was an inadequate foundation to justify admission of the memorandum. In any event defendant was not prejudiced by this ruling for he cross-examined Rehberg as to the contents of the memorandum and had the opportunity to cross-examine Patrolman Todd as to the actual events of that morning. Further we see no support in the memorandum to the suggestion that the vehicle was not locked.
The Rehberg and Calo affidavits were submitted by the State in support of the State's pretrial motion to compel defendant to submit to the taking of a blood sample. The affidavits summarized the report of Tarver, who had determined that certain of the bloodstains discovered on the victim's clothing "gave reactions" for blood type "AB." Predicated on Tarver's *483 report the affiants opined that a sample of defendant's blood would reveal his blood type to be "AB." In fact defendant had blood type "O."
Defendant argued that these affidavits were necessary to the defense because they would have established that a third party bled on the sweatshirt and defendant sought to confront the State with this theory. Since the State's theory was based upon the conclusions in Tarver's report, and this report was admitted into evidence, the court denied defendant's request. Clearly there was no error in this ruling. Certainly the affiants only had a theory tying the blood type to defendant. Defendant was free to argue the exculpatory value of the evidence even without the affidavits. This was not a case where the affiants had knowledge that the assailant's blood was on the shirt. There was no abuse of discretion in the ruling. See Purdy v. Nationwide Mutual Ins. Co., 184 N.J. Super. 123, 130 (App.Div. 1982).
Defendant contends that the trial judge erred in refusing to suppress statements he made to the police on March 12, 1982. He contends that his Fifth Amendment right were violated because he was not warned he was the target of the investigation.
We have, of course, already set forth the circumstances surrounding defendant's giving the statement. But we reiterate that he came voluntarily to the police station and even though he was not arrested was fully advised of his Miranda rights before he gave the statement. Further defendant certainly knew he was at least a suspect. He had already been questioned in the matter, had taken a polygraph and had complained of harassment from private investigators. Finally we point out that while defendant may have been a target the police were not obliged to arrest him. It is possible that he might have explained away any information against him.
In New Jersey a target of a grand jury proceeding must be warned of his status when he is brought before the *484 grand jury so that he recognizes the danger of incriminating himself. See State v. Vinegra, 73 N.J. 484, 488 (1977). But we see no indication in our cases that the target doctrine should be extended to mere investigatory questioning. See Van Horn v. City of Trenton, 80 N.J. 528, 534-536 (1979). In fact we think the doctrine should not be so extended. It would be very difficult to ascertain in an ordinary criminal case when a person had become an investigatory target or was simply under suspicion. Further, extension of the target doctrine would invalidate the use of statements which were neither coerced nor invalid under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We see no reason to give a criminal suspect these added protections and thereby unreasonably interfere with police investigatory methods. The evidence which defendant seeks to suppress is not unreliable and thus its admission into evidence advanced rather than interfered with the fact finding process.
We have carefully reviewed the other issues raised by defendant and find them to be clearly without merit. R. 2:11-3(e)(2).
Affirmed.