**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3169-16T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHN DEROSA, a/k/a JOHNNY
BO DEROSA, JOHNNIE B.
DEROSA, JOHN N. DEROSA,
JOHNNY DEROSA, SELVIO
URIBE, JOHNNYBOY, JOHNIE
DEROSA, and NICHOLAS
DEROSAJOHN,

    Defendant-Appellant.

_____

Argued January 30, 2019 – Decided July 3, 2019

Before Judges Koblitz, Ostrer and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 10-06-1170.

John Walter Douard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John Walter Douard, of counsel and on the briefs).

Charles C. Cho, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Charles C. Cho, on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant John DeRosa appeals from his conviction of murder; felony murder; armed robbery; unlawful possession of a weapon; and possession of a weapon for an unlawful purpose. Defendant argues the court improperly admitted his girlfriend's statement, which she made while addicted to heroin and could not recall at trial, hampering defendant's ability to cross-examine her. Defendant also argues the court should have dismissed the indictment because the State failed to preserve a segment of surveillance footage. In a pro se brief, defendant challenges several evidentiary rulings. Finally, defendant contends his life sentence was excessive. Having reviewed defendant's arguments in light of the record and applicable principles of law, we affirm.

I.

We discern the following facts from the record. On the morning of August 18, 2009, defendant and his two co-defendants, Edmir Sokoli and Elvis Feratovic, robbed a jewelry store in Kearny that belonged to Honorio and Sylvia Egoavil, husband and wife. In preparing for the robbery, defendants planned to

2

bind the owners at gunpoint, steal the jewelry, and exit through the back of the store, where Feratovic would wait in his car. Sokoli testified that the morning of the robbery, Feratovic drove him and defendant around the block "once or twice . . . [m]aybe three times" until they saw Honorio step out for some coffee. Sokoli and defendant entered the store, disguised in wigs and fake beards and mustaches. They were surprised to find Sylvia was not alone. Her son Xavier had come to help his parents and stood with his mother in the back of the store. Defendant warned them to stay put as Sokoli stuffed jewelry into a bag. Xavier moved towards defendant; defendant shot him four times, striking him in the head, torso, and leg. Xavier died on the floor.

Questioned a week later, defendant's then-girlfriend, Larissa Fuzia, provided an alibi for defendant. Shortly afterwards, Fuzia entered a drug-rehabilitation program to treat her heroin addiction. Upon further questioning during and after her rehabilitation, Fuzia admitted defendant had come home on the day of the crime and told her he shot someone during a robbery that "went bad." He also told her to dispose of a bag in their apartment; the bag contained the remnants of disguise props – wigs, beards, mustaches, and glue. Fuzia testified that, three days before the robbery-homicide, defendant and she had

A-3169-16T4

purchased the disguises from a New York City magic and costume store, which she named.

A June 15, 2010 indictment principally charged defendant with first-degree murder, felony murder, and robbery while armed with a deadly weapon; and second-degree unlawful possession of a weapon and possession of a weapon for an unlawful purpose. The court denied defendant's motion to dismiss the indictment on grounds of prosecutorial misconduct before the grand jury.

The State produced surveillance footage from the morning of the robbery, which it copied from the hard drive of a neighboring store. Though the hard drive reportedly contained two months of surveillance, the State disclosed only twenty minutes of it, from 8:45 to 9:05 a.m. on the day of the crimes. The State stipulated that the rest of the video was lost or misplaced. The State maintains that the preserved segment showed Feratovic's car circle the block three times, the last time at 8:58.[1] It then shows two unidentifiable individuals enter the store before the robbery, which Sylvia said occurred at about 9:00 a.m.

Before trial, the court denied defendant's motion to compel the production of the missing video, concluding that the court could not compel production of something the State did not possess. However, the court held that defendant

---

[1] The record on appeal does not include the video excerpt played for the jury.

would be entitled to an adverse inference if he established that the State possessed the video and lost it.

New counsel for defendant moved to dismiss the indictment before a second judge, who would ultimately preside over the trial, arguing the missing footage would have helped exculpate defendant by contradicting Sokoli's testimony. The trial court denied the motion. Relying on State v. Serret, 198 N.J. Super. 21, 26 (App. Div. 1984), and State v. Casele, 198 N.J. Super 462, 469-70 (App. Div. 1985), the court held that defendant had to show bad faith by the State in failing to preserve the potentially exculpatory footage. However, the judge affirmed that he would issue an adverse-inference charge. Defendant also moved pretrial to suppress Fuzia's statements, claiming they lacked reliability, which the trial court denied.

At trial, consistent with the court's ruling, the State introduced the video and the court instructed the jury that it could infer that the missing footage would have adversely affected the State's case. Xavier's mother gave a physical description of the shooter, but did not make an in-court identification. Feratovic testified that defendant planned the robbery and was armed. Sokoli testified he saw defendant shoot Xavier. At least one bystander also recalled seeing a man

A-3169-16T4

run out of the jewelry store that morning, holding a handgun, who matched defendant's description.

Fuzia testified, but she could not recall any detail of her statements to the police or when she gave them, despite counsel's attempts to refresh her memory. After an N.J.R.E. 104 hearing, the trial court held her testimony admissible as "past recollection recorded" under N.J.R.E. 803(c)(5). Over defendant's objection, the court instructed the jury to determine if defendant in fact made the statements that Fuzia attributed to him, and to consider "the circumstances and facts as to how the statement was made, as well as all other evidence in this case relating to this issue."

To corroborate Fuzia's account of the prop purchase, the State introduced, through a former store employee, a photocopied sales receipt that listed "hair goods" and makeup for $289.61 – Fuzia had said the cost was between $250 and $290 – but did not identify the purchaser or the specific items bought. The receipt also indicated that the purchase was made on Sunday, August 16, although Fuzia told the police she and defendant bought the items on Saturday, August 15, 2009. The employee verified that he executed the sale. Though the receipt did not specify the hair goods and makeup sold, the employee testified that the number of items and their prices fit with a purchase of two wigs, two

6

fake beards, two mustaches, adhesive gum and adhesive gum remover. On cross-examination, the employee conceded that he could not be certain about what "hair goods" or "makeup" included, and that the store owner searched for a receipt that could have matched items the detectives had specified.

Also at trial, the medical examiner, Dr. Lilavois, testified about the injuries to the victim's body – which included gunshots to his head, chest, and leg – based on contemporaneous photographs of the body and a report the previous medical examiner, Dr. Blumenfeld, prepared. Dr. Lilavois stated that his testimony reflected his own independent conclusions based on those materials.

Before trial, Dr. Lilavois submitted a report stating simply that, based on his own independent review of the photos and report, he concurred with Dr. Blumenfeld's conclusions. Defendant argued, citing State v. Bass, 224 N.J. 285 (2016), that the Confrontation Clause barred this statement or the reading of Dr. Blumenfeld's report at trial. However, the prosecutor assured the court he would introduce neither written statement and would instead rely solely on Dr. Lilavois's oral testimony. The trial judge then denied defendant's application. Defense counsel did not object at any point during the State's direct examination of Dr. Lilavois.

Defendant did not testify. The defense called several witnesses to raise doubts about the appearance of the two robbers seen fleeing the jewelry store. The defendant also called a witness to establish that, at the behest of the prosecutor's office, Sokoli and Feratovic were incarcerated in the same cell for an extended period of time, suggesting that they had ample time to coordinate their testimony. The defense theory was that Sokoli, Feratovic and Fuzia lied out of self-interest. In summation, the defense highlighted inconsistencies in their testimony.

The jury convicted defendant on all counts. At sentencing, the trial judge noted that defendant had prior convictions of murder and other crimes. Concluding that defendant had "an absolute disregard for the law," the judge sentenced him to a life term on the murder count and to concurrent terms of twenty years for armed robbery and ten years for unlawful possession of a weapon. Pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2(d)(1), defendant's parole ineligibility period was sixty-three years and nine months. Defendant was fifty-two years old when sentenced.

In his counseled appellate brief, defendant raises the following points:

POINT I

DEROSA WAS DENIED A FAIR TRIAL WHEN THE JUDGE ALLOWED THE PROSECUTOR TO READ

8    A-3169-16T4

INTO THE RECORD FUZIA'S UNRELIABLE STATEMENTS, MADE UNDER DURESS WHILE IN A DRUG REHAB PROGRAM, DETAILS OF WHICH SHE WAS UNABLE TO RECALL, THEREBY PREVENTING ANY CROSS-EXAMINATION. U.S. CONST. AMEND. VI, XIV; N.J. CONST. ART. 1, ¶¶ 1, 10.

POINT II

THE STATE'S LOSS OR DESTRUCTION OF SURVEILLANCE FOOTAGE OF THE CRIME SCENE BEFORE AND AFTER THE ROBBERY/ MURDER CONTAINING POTENTIALLY EXCLUPATORY [sic] FOOTAGE REQUIRES REVERSAL OF DEROSA'S CONVICTIONS.

A.  Because DeRosa's Due Process Rights Were Violated, the Court Erred in Denying His Motion to Dismiss the Indictment.

B.  The Jury Instruction Provided by the Court Was Insufficient to Cure the Harm Caused by the Discovery Violation, Requiring Reversal and a Remand for a New Trial.

POINT III

THE AGGREGATE TERM OF LIFE, WITH 63 3/4 YEARS WITHOUT PAROLE, IS EXCESSIVE.

In a supplemental pro se brief, defendant raises the following additional points:

POINT I

THE JUDGE ERRED BY NOT DISMISSING THE INDICTMENT BASED ON IMPROPER PROSECUTORIAL MISCONDUCT.

a)      The Prosecutor Failed to Present Exculpatory Evidence to the Grand Jury That Directly Negated Guilt of the Accused and was Clearly Exculpatory.

b)      The Prosecutor Wrongly Caused Two Cooperating Witnesses to Share the Same Cell for Seven Years While This Case Was Pending Trial.

c)      The Prosecutor Improperly Commented to the Grand Jury About Defendant's Prior Conviction and Sentence for Homicide.

POINT II

THE TRIAL COURT ERRED BY ALLOWING THE ABRACADABRA COSTUME STORE RECEIPT INTO EVIDENCE, VIOLATING THE NEW JERSEY RULES OF EVIDENCE.

POINT III

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S EX-PARTE APPLICATION FOR A PRIVATE INVESTIGATOR AFFORDED TO CRIMINAL DEFENDANT'S [sic] BY THE SIXTH AMENDMENT OF THE U.S. CONSTITUTION AND BY ART. 1, PARA. 10 OF THE NEW JERSEY CONSTITUTION.

POINT IV

THE TRIAL JUDGE ERRED BY ALLOWING DR. LILAVOIS TO TESTIFY TO THE CONTENTS OF AN AUTOPSY REPORT OF ANOTHER MEDICAL EXAMINER, THUS VIOLATING DEFENDANT'S CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ART. I, PARA. 10 OF THE NEW JERSEY CONSTITUTION.

POINT V

THE TRIAL JUDGE ERRED BY GIVING IMPROPER INSTRUCTIONS ON THE VERDICT SHEET, WHICH MISLEAD [sic] THE JURY INTO RENDERING GUILTY VERDICTS FOR FIRST AND SECOND DEGREE ROBBERY, ON A SINGLE COUNT OF ROBBERY IN THE INDICTMENT, VIOLATING DEFENDANT'S DOUBLE JEOPARDY PROTECTIONS UNDER THE FEDERAL AND STATE CONSTITUTIONS. (Not Raised Below).

II.

A.

Defendant first argues that the trial court erred in admitting Fuzia's incriminating statement because its prejudicial effect substantially outweighed its probative value. He argues that Fuzia's memory loss prevented him from challenging her statement effectively on cross-examination, such as by eliciting that she may have felt pressure to comply with the police because of her own legal troubles. Defendant points out that at the end of her police interview, Fuzia

asked the interviewer if she had "done good" by giving the investigators "what [they] needed." Defendant also argues Fuzia's statements were merely cumulative because the co-defendants, the prop store employee, and the store's sales receipt together presented the State's narrative of the robbery's planning and execution. Finally, defendant claims the judge's instruction did not cure the harm because it did not refer specifically to Fuzia's incriminating statement, and did not stress to the jury that Fuzia's memory loss prevented defendant from cross-examining her effectively.

We review evidentiary rulings for abuse of discretion and will reverse only upon finding a "manifest denial of justice." State v. Cole, 229 N.J. 430, 449 (2017) (quoting State v. Carter, 91 N.J. 86, 106 (1982)). A trial court may exclude relevant evidence whose "probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. The trial court, as gatekeeper, "is in the best position to engage in th[e] [Rule 403] balancing process." State v. Ramseur, 106 N.J. 123, 266 (1987).

Evidence has significant probative value when no other evidence can prove the same fact. See State v. Long, 173 N.J. 138, 164-65 (2002) (holding

murder defendant's statement had great probative value as the only evidence regarding motive). Conversely, evidence loses probative value the more redundant it becomes. See State v. Johnson, 120 N.J. 263, 297-99 (1990) (finding little probative value in numerous photos of bloody victims where medical examiner already testified about extent of assault); State v. Taylor, 350 N.J. Super. 20, 37 (App. Div. 2002) (finding little probative value in video of victim's final minutes showing dying declaration where several other witnesses confirmed the declaration).

The court may allow the jury to hear a witness's past recorded statement if the witness, due to "impaired memory," State v. Gore, 205 N.J. 363, 376 (2011) (quoting State v. Williams, 226 N.J. Super. 94, 103 (App. Div. 1988)), cannot now "testify fully and accurately" about the statement, N.J.R.E. 803(c)(5), so long as the statement:

> (A) was made at a time when the fact recorded actually occurred or was fresh in the memory of the witness, and (B) was made by the witness or under the witness' direction or by some other person for the purpose of recording the statement at the time it was made, and (C) the statement concerns a matter of which the witness had knowledge when it was made, unless the circumstances indicate that the statement is not trustworthy.
>
> [N.J.R.E. 803(c)(5).]

A-3169-16T4

"[T]he portion the witness does not remember may be read into evidence but shall not be introduced as an exhibit over objection." Ibid.

We shall not disturb the trial court's decision to admit Fuzia's September 28 statement. The court did not abuse its discretion in finding that the statement's prejudicial effect, if any, did not substantially outweigh its probative value. While the statement's credibility could be challenged due to Fuzia's heroin addiction at the time, her initial exculpatory statement suffered from the same defect. The jury heard both statements, as well as the circumstances in which Fuzia made them, and could determine whether to credit either one. The court aided the jury in this task by instructing them to regard Fuzia's statements with the appropriate wariness given the circumstances in which she made them.

Defendant claims that Fuzia was under duress to give the officers the statement they "needed" as a result of her own legal problems. This claim, which defendant argued in closing, goes to the credibility of Fuzia's statement, not its admissibility. Finally, though defendant stresses his inability to cross-examine Fuzia effectively because of her memory impairment, N.J.R.E. 803(c)(5) explicitly permits the recorded statement of just such a witness where the statement appears trustworthy.

14

Nor was Fuzia's statement cumulative. It bolstered the State's case by recanting her first, exculpatory statement and corroborating the testimony of the co-defendants, who defendant claimed falsely named him as the shooter. The statement also provided another perspective of the robbery-homicide – that of defendant's own former girlfriend – and fleshed out the State's narrative with details of defendant's purchase of disguises and his attempt to sell the jewelry. Therefore, the trial court did not err in admitting Fuzia's statement.

B.

Defendant also contends that the State's loss or misplacement of surveillance footage deprived him his right to due process by preventing him from presenting a complete defense. He maintains that the missing segment may have weakened the State's case by showing that Sokoli testified falsely about Feratovic driving him and defendant around the block before Sokoli and defendant entered the jewelry store. Defendant urges us, as a matter of State constitutional interpretation, to dispense with the requirement, established in Arizona v. Youngblood, 488 U.S. 51, 58 (1988), that a defendant must prove the police's bad faith in failing to preserve evidence that was only potentially exculpatory. "Without bad faith on the part of the State, 'failure to preserve potentially useful evidence does not constitute a denial of due process of law.'"

15

George v. City of Newark, 384 N.J. Super. 232, 243 (App. Div. 2006) (quoting Youngblood, 488 U.S. at 57).[2]

Instead of the "bad faith" standard, defendant advocates a "balancing test" that treats the likelihood of bad faith as one factor to be weighed against the potential for prejudice. In support of that standard, defendant relies on pre-Youngblood decisions of our court, out-of-state decisions and academic commentators. Defendant also finds support for his position in our Supreme Court's rejection of the "good faith exception," adopted by the United States Supreme Court, to the exclusionary rule for illegal searches and seizures. See State v. Novembrino, 105 N.J. 95, 158 (1987). Alternatively, defendant argues the State recklessly lost the footage and that recklessness amounts to bad faith. Finally, he contends that the trial court's adverse-inference instruction failed to remedy the prejudice resulting from the loss of evidence.

Reviewing this legal question de novo, we decline to jettison the bad faith requirement. We recognize the cogent critiques of the "bad faith" test, beginning with the concurring and dissenting justices in Youngblood and including those

_____

[2] By contrast, loss or destruction of evidence with apparent exculpatory value, even in good faith, violates due process if the evidence was material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); State v. Knight, 145 N.J. 233, 246 (1996).

A-3169-16T4

of several of our sister states' courts and of academic commentators. See Youngblood, 488 U.S. at 60-61 (Stevens, J., concurring in the judgment) (finding the majority's rule too broad because "there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair"); id. at 61; (Blackmun, J., dissenting) (arguing that the majority undermines a criminal defendant's right to "a fair trial, not merely a 'good faith' try at a fair trial"); see also State v. Tiedemann, 162 P.3d 1106, 1117 (Utah 2007); State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999); State v. Morales, 657 A.2d 585, 593 (Conn. 1995); State v. Osakalumi, 461 S.E.2d 504, 512 (W. Va. 1995); State v. Delisle, 648 A.2d 632, 642-43 (Vt. 1994); Commonwealth v. Henderson, 582 N.E.2d 496, 497 (Mass. 1991); Hammond v. State, 569 A.2d 81, 87 (Del. 1989); Norman C. Bay, Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith, 86 Washington U. L. Rev., 241, 278-96 (2008); Matthew H. Lembke, Note, The Role of Police Culpability in Leon and Youngblood, 76 Va. L. Rev. 1213, 1237-41 (1990).

However, our Supreme Court followed the Youngblood standard in State v. Marshall, 123 N.J. 1, 109 (1991), without any indication that a different test

17

would govern a due process claim under our State's Constitution. On the basis of that decision, we have declined to follow other jurisdictions that have determined that proof of bad faith is not required by their state constitutions. State v. Mustaro, 411 N.J. Super. 91, 103 n.4 (App. Div. 2009) (declining to follow State v. Johnson, 951 A.2d 1257, 1284 (Conn. 2008)); see also State v. Richardson, 452 N.J. Super. 124, 140 (App. Div. 2017) (stating that our Supreme Court adheres to Youngblood). We will not infer a "departure from controlling precedent" absent "an unmistakable" signal from the Supreme Court, State v. Hicks, 283 N.J. Super. 301, 308 (App. Div. 1995), recognizing that any such "departure should be undertaken 'by the court of last resort, and not by the Appellate Division,'" In re State ex rel. A.C., 115 N.J. Super. 77, 84 (App. Div. 1971).

In State v. Hollander, 201 N.J. Super. 453, 479 (App. Div. 1985), which we decided before Youngblood or Marshall, we identified three factors at play in the case law that determined whether the "suppression, loss or destruction of physical evidence" violated the right to due process. They were: "(1) whether there was bad faith or connivance on the part of the government; (2) whether the evidence suppressed, lost or destroyed was sufficiently material to the defense; [and] (3) whether defendant was prejudiced by the loss or destruction of the

evidence." Ibid. (citations omitted). We have reiterated these factors since. See, e.g., George, 384 N.J. Super. at 243; State v. Dreher, 302 N.J. Super. 408, 483 (App. Div. 1997); overruled on other grounds by State v. Brown, 190 N.J. 144, 159 n.1 (2007).

Even if that multi-factor formulation creates some tension with Youngblood, it offers no refuge for defendant. In Dreher, though we cited these factors, we clarified that, "[i]n the absence of bad faith, relief should be granted to a defendant only where there is a 'showing of manifest prejudice or harm' arising from the failure to preserve evidence." 302 N.J. Super. at 489 (quoting DeVitis v. N.J. Racing Comm'n, 202 N.J. Super. 484, 494 (App. Div. 1985)). Such manifest prejudice may result from the loss of evidence that might have challenged an essential element of the State's case, such as a sample of semen that could exclude a defendant as the perpetrator of a sexual assault. See Youngblood, 488 U.S. at 69 (Blackmun, J., dissenting) (arguing that a "court should focus on the type of evidence, the possibility it might prove exculpatory, and the existence of other evidence going to the same point of contention in determining whether the failure to preserve the evidence in question violated due process").

The missing recording in this case is not that type of evidence. Conceivably, it could serve to impeach the co-defendant, who claimed he circled the jewelry store block with defendant. Cf. United States v. Bagley, 473 U.S. 667, 676 (1985) (applying Brady to "[i]mpeachment evidence . . . as well as exculpatory evidence"). However, it was not "sufficiently material to the defense" such that its loss caused great prejudice. See Hollander, 201 N.J. Super. at 479.

Notably, in argument to the trial court, defense counsel questioned whether the produced video segment confirmed Sokoli's testimony that the three cohorts circled the store as many as three times shortly before the robbery. Both defense counsel and the prosecutor, in summation, focused on the recorded instance of Feratovic's car passing the store at 8:58 a.m. Defense counsel suggested that the missing recording may have shown that Sokoli and Feratovic circled the store earlier in the morning, before Feratovic picked up defendant, discrediting Sokoli and demonstrating that Sokoli and Feratovic may have acted without defendant. However, the prosecutor, recalling the video evidence for the jury, said that the recording in evidence showed Feratovic pass the jewelry store three times, at 8:53, at a few seconds before 8:55, and then at 8:58. If true, that would corroborate Sokoli's testimony about the number of times all three

circled the block immediately before the robbery. In sum, the lost evidence would neither exculpate defendant nor rebut the other substantial evidence of guilt.

Alternatively, defendant contends that the State's loss of the recording was so reckless that it amounted to bad faith. There is some authority for the proposition that prosecutorial recklessness in the preservation of evidence may constitute bad faith. See United States v. Yevakpor, 419 F. Supp. 2d. 242, 246, 252 (N.D.N.Y. 2006) (finding bad faith where the government deleted portions of surveillance footage because "it was not an inadvertent failure . . . to preserve, but an affirmative order . . . to only preserve the selected three minutes of tape knowing that the subject of the video was to face criminal proceedings," despite the "routine" nature of the erasure); State v. Langanella, 144 N.J. Super. 268, 283 (App. Div. 1976) (stating, in dictum, that "egregious carelessness or prosecutorial excess tantamount to suppression" may result in a deprivation of due process). However, the record does not reflect that recklessness – as opposed to negligence – caused the disappearance of the disk onto which the neighboring store's surveillance footage was stored.

As for the adverse-inference charge, defendant claims the court did not adequately cure the harm caused by the missing footage because the court

A-3169-16T4

merely stated that the jury was permitted to make an adverse inference, instead of ordering it to do so. However, in the charge conference, defense counsel conceded the propriety of a permissive adverse-inference instruction and suggested language for the court consistent with that position. Having invited the court's instruction, defendant may not argue now that the instruction was flawed, absent a showing of an error "so egregious as to 'cut mortally into his substantive rights.'" Ramseur, 106 N.J. at 282 (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)). No error, let alone one so egregious, occurred here, as defendant provides no New Jersey authority for a "mandatory" adverse inference, and we have found none. Even where the State intentionally destroyed evidence, our Supreme Court approved a permissive adverse-inference charge. State v. Dabas, 215 N.J. 114, 141 (2013) (approving permissive adverse-inference charge in murder trial); see also Richardson, 452 N.J. Super. at 140 n.8 (noting that "the instruction outlined in Dabas . . . informs the jury of the State's obligation to preserve evidence, but leaves it to the jury to determine whether to draw an adverse inference").

III.

Defendant claims the life sentence without parole eligibility for 63.75 years is excessive because it effectively ensures he will never become eligible

for parole, as he is now close to sixty years old. Defendant argues the court failed to be "mindful of the real-time consequences of NERA." See State v. Marinez, 370 N.J. Super 49, 58 (App. Div. 2004). We disagree.

The trial court found, as aggravating factors, that defendant would likely commit another offense; had a prior record of indictable convictions; and required deterrence. See N.J.S.A. 2C:44-1(a)(3), (6), (9). It found no mitigating factors. The judge recounted defendant's extensive criminal record, including his 1981 convictions of first degree murder, unlawful possession of a firearm, attempted homicide and weapon possession. The judge concluded that defendant displayed "an absolute disregard for the law" and his criminal behavior "left victims," including the unarmed Xavier, whom defendant shot in the presence of his mother. Based on those findings, the court sentenced defendant to life in prison for the purposeful murder of Xavier.

Exercising our deferential standard of review, State v. Fuentes, 217 N.J. 57, 70 (2014), we are satisfied that the court adhered to sentencing guidelines and relied upon competent and credible evidence, and the sentence was not "clearly unreasonable so as to shock the judicial conscience." Ibid. (quoting State v. Roth, 95 N.J. 334, 365 (1984)).

A-3169-16T4

IV.

We turn to the points raised in defendant's pro se submission.

A.

We discern no merit in defendant's contention that the State misled the grand jury, requiring dismissal of the indictment, by presenting only Fuzia's second, inculpatory statement. A prosecutor may not deny a grand jury "access to evidence that is credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that the State has not made out a prima facie case against the accused." State v. Hogan, 144 N.J. 216, 236 (1996). An alibi that "directly negates" an accused's guilt falls into that category. Id. at 238. However, a prosecutor need not reveal exculpatory evidence that lacks credibility, such as Fuzia's alibi statement, which was contradicted by other witnesses and Fuzia herself. See ibid.

B.

Defendant also challenges the trial court's denial of his motion to sequester his co-defendants before trial. As noted, the prosecutor requested that they be incarcerated in the same cell. That occurred after they entered into their plea agreements. The trial court granted defendant's pre-trial motion to sequester

the two for the duration of the trial under N.J.R.E. 615, but it denied defendant's request to sequester them before trial, finding no legal support for such an order.

Decisions regarding witness sequestration lie within the trial court's discretion. State v. Miller, 299 N.J. Super. 387, 399 (App. Div. 1997). The trial court did not abuse its discretion here. Even if the court had the authority to order separation of the witnesses before trial, defendant has shown no prejudice, as the two had already shared a cell for several years. Furthermore, defendant highlighted the witnesses' living arrangement in summation to suggest they had an opportunity to coordinate their testimony.

C.

We reject defendant's argument that the trial court erred in permitting the introduction of the sales receipt from the costume store. The discrepancies between the date on the receipt and the date Fuzia provided certainly raised questions as to whether the receipt documented the purchase that Fuzia described. However, the trial court reasonably exercised its discretion in admitting the document, leaving it to the jury to weigh its probative value. See State v. J.M., Jr., 225 N.J. 146, 157 (2016). Although the receipt's imprecision made it susceptible to challenge as evidence of the purchase, that did not render it inadmissible. See State v. Coruzzi, 189 N.J. Super. 273, 302 (App. Div. 1983)

(holding defendant's possession of cash in denominations corresponding "in a 'fairly close way'" to cash taken, while inconclusive on its own, was relevant in light of other incriminating evidence) (citation omitted).

D.

Defendant also argues the trial court denied him the necessary means of presenting a defense by denying his application for a private investigator. The application followed denial by the Office of the Public Defender (OPD) of the same request. Defense counsel contended that the OPD's staff investigator was unable to pursue essential avenues of investigation, including reviewing video footage, interviewing unnamed potential witnesses, and questioning Fuzia.

We consider defendant's argument that he was denied investigatory resources under the same standard governing claims of ineffective assistance of counsel. See State v. DiFrisco, 174 N.J. 195, 244 (2002) (analyzing defendant's claim that he was denied effective expert services as an ineffective-assistance-of-counsel claim). Under the familiar two-prong standard established in Strickland v. Washington, 466 U.S. 668, 687 (1984), defendant must show that he was denied effective assistance of counsel as a result of inadequate investigatory services, and a reasonable probability that, but for that denial, the verdict would have been different. Defendant has made only conclusory claims

about the inadequacy of the OPD investigator, and has provided no detail as to the investigative steps a private investigator would have taken, let alone provided evidence that such an investigation would have produced evidence that could have affected the trial result. See State v. Porter, 216 N.J. 343, 353 (2013) (stating that "when a petitioner claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification" (quoting State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999))).

E.

Finally, we reject defendant's contention that Dr. Lilavois's testimony as to the cause of death violated his rights under the Confrontation Clause by relying on Dr. Blumenfeld's examination. "[T]he State may present the testimony of a qualified expert who has conducted independent observation and analysis regarding an autopsy conducted by a medical examiner who is unavailable to testify at trial, without violating the defendant's confrontation rights . . . ." Bass, 224 N.J. at 291-92; see also State v. Michaels, 219 N.J. 1, 45-46 (2014). That is what Dr. Lilavois did here. He did not simply "parrot" Dr. Blumenfeld's findings. See Bass, 224 N.J. at 319 (stating that "parroting"

of an autopsy report violates the Confrontation Clause). Dr. Lilavois explained how he arrived at his own conclusions based on the photos in the file. He referenced Dr. Blumenfeld's report only three times during his testimony and repeatedly confirmed he was stating his own conclusions based on his independent study of the photos and report.

To the extent not addressed, defendant's remaining points lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3169-16T4