**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0678-21

IN THE MATTER OF
LATERA GRIFFIN,
HUDSON COUNTY,
DEPARTMENT OF
CORRECTIONS.

_____

Argued October 11, 2023 – Decided January 18, 2024

Before Judges Haas and Natali.

On appeal from the New Jersey Civil Service Commission, Docket No. 2019-1831.

Arthur J. Murray argued the cause for appellant Latera Griffin (Alterman & Associates, LLC, attorneys; Stuart J. Alterman and Timothy J. Prol, on the briefs).

Cindy N. Vogelman argued the cause for respondent Hudson County Department of Corrections (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Cindy N. Vogelman, of counsel and on the brief; Priscilla E. Savage, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Craig S. Keiser, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Latera Griffin, a corrections officer employed by Hudson County Department of Corrections (HCDC), appeals from the final agency decision of the Civil Service Commission (CSC) which affirmed her termination after the results of a urinalysis conducted pursuant to HCDC's random drug testing policy indicated the presence of benzoylecgonine, a cocaine metabolite. Before us, Griffin contends the HCDC's urine screening failed to comply with the Attorney General's Law Enforcement Drug Testing Policy (revised April 2018) (Drug Testing policy), which was incorporated into and implemented by Attorney General Law Enforcement Directive No. 2018-2. See Off. of the Att'y Gen., Law Enf't Directive No. 2018-2, Statewide Mandatory Random Drug Testing (Mar. 20, 2018). That failure, according to Griffin, deprived her of her due process right to challenge the results of her positive sample. She also challenges certain of the Administrative Law Judge's (ALJ) discretionary procedural and evidentiary rulings. We reject all of these arguments and affirm.

I.

On August 16, 2018, Griffin was selected for random drug testing pursuant to the HCDC's "Drug-Free Workplace: Alcohol and Drug Testing" policy (Drug-Free Workplace policy). Prior to that test, Griffin worked for

HCDC for approximately thirteen years and had submitted to random drug testing twice without incident.

On March 20, 2018, approximately five months before her August 2018 drug test, the Attorney General (AG) promulgated Directive No. 2018-2. Directive No. 2018-2 stated, "[t]his Directive shall take effect immediately upon issuance" and "[a]ll drug testing policies shall be adopted and/or revised in accordance with this Directive within [thirty] days."

The revised Drug Testing Policy addressed specific sampling procedures for providing two urine samples. As relevant to the issues before us, the policy provided "[a] donor whose specimen tested positive may only challenge the positive test result by having the second specimen independently tested. The first specimen will not be retested."

Although HCDC revised its Drug-Free Workplace policy in April 2018, it did not incorporate the specimen collection procedures outlined in the AG's Drug Testing Policy. Contrary to the Drug Testing Policy, the HCDC's policy, which became effective on November 19, 2011, permitted donors to submit two urine samples, but did not require them to do so. Specifically, HCDC's policy stated, "[d]onors shall have the option of providing a second specimen that must be collected at the same time as the first. If the donor chooses not to submit a

3

sample, the donor, on a specimen acquisition report, shall sign the waiver of this option."

Contrary to both the AG's Drug Testing policy and HCDC's Drug-Free Workplace policy, Griffin provided only a single urine sample and did not sign a waiver of her option to provide a second sample. As noted, Griffin's urine sample tested positive for a cocaine metabolite.

HCDC issued a preliminary notice of disciplinary action and charged Griffin with: conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(6); neglect of duty, N.J.A.C. 4A:2-2.3(7); and other sufficient cause, N.J.A.C. 4A:2-2.3(9). After a departmental hearing, HCDC terminated Griffin from her position and entered a final notice of disciplinary action (FNDA). Griffin appealed the FNDA and the matter was transferred to the Office of Administrative Law as a contested case.

Before the ALJ conducted any hearings, Griffin moved for summary decision, which the ALJ denied without a hearing. The parties then appeared before the ALJ for hearings on May 30, 2019, July 19, 2019, and September 25, 2019, where HCDC presented testimony of its Deputy Director, Michael Conrad, Dr. Robert Havier, the acting director of the New Jersey State Toxicology Laboratory, Detective Gabriel Diaz, and Lieutenant Erika Patterson.

4

The ALJ concluded HCDC's witnesses testified directly, credibly, and consistently with one another with respect to the HCDC's urine collection and testing processes.

Director Conrad, Lieutenant Patterson, and Detective Diaz testified regarding the procedures HCDC implemented during the August 2018 testing. With respect to Griffin's testing, Detective Diaz recalled she "came in with three other female officers" and he provided each of the four female officers with two bottles and recommended they fill both of them. According to Detective Diaz, he specifically explained "at the time of . . . the testing to [Griffin] that if you're confident you won't have any issues going forward, you can do one . . . but that is completely . . . up to you. But . . . if you feel like you're going to have issues down the road, please do use a second sample." Subsequently, Detective Diaz testified he specifically "advised her that the only way she could contest a positive test is a second sample."

Detective Diaz further testified he provided similar instructions relating to the second sample to everyone that day, including Griffin. He acknowledged, however, that he "forgot to use" the waiver form. Although the other three officers who tested at the same time as Griffin all submitted two samples, multiple officers who were tested that day provided only one sample.

5

Dr. Havier testified with respect to the State Toxicology Laboratory's testing procedures, including those used to test Griffin's sample. Based on the test results, he stated Griffin's urine tested positive for benzoylecgonine "and that his conclusion was made within a reasonable degree of scientific certainty." Additionally, according to Dr. Havier, the level of benzoylecgonine discovered in Griffin's sample was "very high" and nothing described in her medication forms could account for such a result. With respect to split samples, Dr. Havier testified the State lab began requiring two samples pursuant to the AG's Drug Testing policy in September 2018, several weeks after Griffin's test.

Due to a scheduling error by Griffin's counsel, he was unable to cross-examine Dr. Havier on the date he originally testified. Dr. Havier appeared for cross-examination on a later date and on cross-examination, Griffin's counsel sought to introduce a letter from the State Toxicology Laboratory dated September 5, 2019, as well as email responses he received from Dr. Havier one day before the September 25, 2019 hearing, both of which counsel claimed impeached portions of Dr. Havier's direct testimony.

The ALJ excluded the letter due to counsel's failure to produce the letter earlier. She similarly determined the emails were inadmissible due to counsel's failures to timely seek email responses from Dr. Havier and alert opposing

6

counsel of his intention to introduce the impeachment evidence. The ALJ was also satisfied Griffin's counsel could sufficiently cross-examine Dr. Havier about the test results without referencing the email exchange. In light of the ALJ's determination, Griffin's counsel stated "I'm going to ask for your recusal" and argued the ALJ was "not letting [him] try this case."

Derrick James, president of Hudson County's local PBA and a corporal for HCDC, helped oversee the August 2018 drug testing and testified on Griffin's behalf. Corporal James testified he was unaware the donors were not provided waivers until after the test results came back. According to Corporal James, he then spoke to the HCDC director about HCDC's failure to provide waivers. The ALJ precluded further testimony pertaining to his conversation with the director, however, as she determined such testimony could improperly impact other cases arising from the August 2018 testing and therefore ran afoul of N.J.R.E. 403(b). She also determined Griffin's counsel failed to identify the testimony's probative value. The ALJ concluded Corporal James testified credibly.

After the third day of hearings, Griffin renewed her application for a summary decision and requested to admit "testimony regarding unprivileged communications between PBA 109 President Derrick James and Director

Edwards" and "email responses of Dr. Havier which he sent on September 24, 2019 in response to inquiries made to him in preparation for his testimony." Griffin also asked the ALJ to take judicial notice of Directive 2018-2.

After considering the parties' submissions and oral arguments, the ALJ denied Griffin's summary decision application and her "evidentiary motions" in a June 2, 2020 order. In her accompanying statement of reasons, the ALJ declined to address Griffin's evidentiary objections, relying on her reasoning on the record during the hearings.

The ALJ also concluded issues of material fact precluded summary decision and explained "the record should continue to be fully developed at the on-going evidentiary hearing." She specifically found issues of material fact existed with respect to whether Griffin waived the second sample, and whether HCDC staff properly instructed Griffin pursuant to the applicable guidelines.

Griffin filed an interlocutory appeal of the ALJ's June 2, 2020 order to the CSC. The CSC declined to review Griffin's interlocutory motion but reserved the right to review the issues raised at the time of final determination. Griffin then filed a motion to recuse the ALJ.

In support of recusal, Griffin's counsel alleged the ALJ, during a May 12, 2020 Zoom conference, suggested "that [he] and/or other attorneys of [his]

A-0678-21

office somehow engaged in conduct which was unethical by corresponding with Dr. Havier in preparation for Dr. Havier's testimony." As best we can discern from the transcript of that conference, Griffin's counsel was referencing a portion of the ALJ's reasoning for excluding Dr. Havier's emails in which she stated, "[w]hat happened was you reached out to [HCDC's] witness without telling [its counsel], and you were admonished in court, and then an email that was not provided to [counsel] was used 'to impeach the expert's testimony.'"

The ALJ denied Griffin's recusal motion in a July 1, 2020 order. The ALJ similarly denied Griffin's motion to reconsider that order in an August 28, 2020 order.

The fourth and final day of hearings took place on June 14, 2021 where Griffin testified on her own behalf and stated she was never instructed to take a split sample or even offered the opportunity to do so. She also denied Detective Diaz's testimony that she refused to take a split sample, and claimed she would have taken one had she been instructed to do so. She also denied ever using illegal drugs, including cocaine. The ALJ found Griffin "obviously ha[d] a self-interest in this matter," and "that she feigned ignorance of her right to give a split sample." The court also found her testimony to be "wholly unbelievable"

9

with respect to her knowledge of the split sample process and her assertion she was only provided with one cup.

Relevant to one of Griffin's arguments before us, the ALJ determined written closing submissions were unnecessary, as the case had been ongoing since 2019 and the parties had previously briefed the contested issues. She therefore relied on the parties' oral closing arguments and after considering the testimony and documentary evidence, concluded HCDC proved the charges against Griffin by a preponderance of the credible evidence. Accordingly, she affirmed the FNDA removing Griffin from employment.

In its decision, the ALJ specifically rejected Griffin's argument that the drug testing procedures were deficient due to the HCDC's failure to mandate she provide a second sample, as she determined the AG's Drug Testing policy did not "go into effect until September 1, 2018" and "there was no proof to the contrary." She further stated, "[t]o that end, this Tribunal was not persuaded by [Griffin]'s arguments of a mandatory second sample." On this point, the ALJ credited Dr. Havier's testimony that the State lab did not require two samples until the month after Griffin's test. She further stated, "[w]hile irrelevant under the facts in this case, for completeness I agree that any test done after September

2018 when reviewed by the courts will likely be scrutinized for due process under the" AG's Drug Testing policy.

The ALJ similarly stated because the Drug Testing policy "and its requirements were not in effect at the time of the test in question, . . . [she] cannot conjecture which test violations would be considered fatal flaws to invalidate positive test results in the future, nor will [she] address that issue as it is not before me." In a footnote, the ALJ further explained the drug policy contained a "revised date[] of April 2018" but did not contain an effective date. The ALJ also observed Griffin never had an independent expert test the "reserve sample from the initial sample frozen at the lab," despite her counsel's assertions it would be tested.

Additionally, the ALJ found "there was no question as to the chain of custody, and no expert opinion to question the test results." She stated, "the appropriate procedure was followed and the validity of the uncontested result was credibly supported by Dr. Havier . . . , [who] opined within a reasonable degree of forensic scientific certainty that Officer Griffin's sample was positive for [c]ocaine, which remains uncontested."

The ALJ specifically found, contrary to Griffin's testimony, she "was given two . . . specimen containers, . . . she was advised of her rights to a second

sample, knew her rights and chose not to give a second sample." She similarly found Detective Diaz provided Griffin a clear statement of her rights prior to the test and she had a thorough opportunity to cross-examine the HCDC's witnesses with respect to the test's validity. Due to Griffin's "time in the [HCDC]" and prior experience with drug tests, the ALJ found "she knew that a second sample was the way to question the validity of a test" and her "due process rights remained intact throughout."

The ALJ also relied on our unpublished opinion in In re Schwaner, No A-0748-14 (App. Div. Dec. 9, 2016) (slip op.), and explained "not every technical deviation from a drug testing process warrants the nullification of the results of that test" or constitutes a due process violation. She further determined Griffin was similarly situated to the donor in Schwaner because she "undertook no effort to test the remaining portion" of her urine sample. The ALJ concluded, "[a]s the policy in effect did not mandate a second sample, . . . there was no deviation of the drug testing process, other than the absence of the waiver form that supported [Griffin's] verbal choice to forego the second sample . . . ."

After an independent evaluation of the record, including Griffin's supplemental exceptions, the CSC accepted and adopted the ALJ's factual findings, legal conclusions, and penalty in a September 22, 2021 order. The

12

CSC also rejected Griffin's "renewed arguments pertaining to the issues presented in the interlocutory review request" as well as her "argument that the ALJ should have been recused." This appeal followed.

II.

Griffin initially contends the CSC's "final administrative determination was arbitrary, capricious, unreasonable, and lacked fair support in the record" due to the "indisputabl[e]" due process violations which led to her removal. On this point, she argues HCDC's "failure to collect a second urine sample, as mandated by the AG's Drug Testing policy, deprived" her of her "due process right to challenge the results of her positive drug test."

Griffin further contends the Drug Testing policy required HCDC to collect two samples from her and provides the only way to challenge positive results "is by having the second urine independently tested." According to Griffin, HCDC's failure to collect a second sample therefore deprived her of her "protected property and liberty interest in her continued employment" with HCDC.

HCDC contends "the ALJ's findings were proper and supported by sufficient credible evidence present in the record." It specifically highlights "Dr. Havier's testimony that the Directive was not to be implemented until September

13

1, 2018," his testimony "that a valid reserve sample from the initial sample frozen at the lab had been preserved and was available for testing by an expert of [Griffin]'s choice," and Detective Diaz's testimony he provided Griffin two specimen cups and informed her of her rights.

Relying on State v. Mercer, 211 N.J. Super. 388, 393 (App. Div. 1986), California v. Trombetta, 467 U.S. 479, 491 (1984), and State v. Casele, 198 N.J. Super. 462, 471 (App. Div. 1985), HCDC maintains "not every failure to follow guidelines or procedures gives rise to a cognizable due process violation," stating, for example, "[the] failure to preserve a primary sample for independent analysis does not give rise to a due process violation." As such, HCDC argues "[f]ailure to mandate that an individual provide a second sample, without showing that such failure resulted in arbitrary action, does not give rise to a due process violation." It further contends "Griffin has raised no valid risk of erroneous deprivation" of a protected right in light of the primary sample's undisputed validity. Relying on an unpublished decision of this court, HCDC similarly contends Griffin's missing second sample is of "limited significance"

14

where there is no evidence "that the initial test produced a false result." [1]  We agree, in part, with HCDC's arguments.

### III.

Our review of decisions by administrative agencies is limited.  In re Stallworth, 208 N.J. 182, 194 (2011).  "In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'"  Ibid. (alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).  In our review, we only determine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Carter, 191 N.J. 474, 482-83 (2007) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

---

[1] We note before us the HCDC and ALJ cite unpublished opinions.  Pursuant to Rule 1:6-7 we have not relied on those authorities as they are of no precedential value.  We cited to In Re Schwaner, supra at pp. 12, 13, merely to explain the ALJ's reasoning.

"[I]f substantial evidence supports the agency's decision, 'a court may not substitute its own judgment for the agency's even though the court might have reached a different result[.]'" Id. at 483 (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).  However, "we are 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue[.]'" Utley v. Bd. of Rev., 194 N.J. 534, 551 (2008) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).  Our review of a "strictly legal issue" is de novo.  In re Langan Eng'g. & Env't Servs., Inc., 425 N.J. Super. 577, 581 (App. Div. 2012) (citing Utley, 194 N.J. at 551).

As a threshold matter, to determine whether the ALJ correctly applied the law, it is necessary that we interpret Directive 2018-2.  Specifically, we must determine whether:  (1) Directive 2018-2 applied at the time of Griffin's testing; and, if so, (2) HCDC violated the directive by failing to collect two samples. "Because such an interpretation presents a purely legal question, we owe no deference to the" ALJ's interpretation.  In re V.L., 441 N.J. Super. 425, 429 (App. Div. 2015).

"Attorney General directives have 'the force of law for police entities.'" In re Atty. Gen. Law Enf't Directives Nos. 2020-5 and 2020-6, 465 N.J. Super. 111, 144 (App. Div. 2020) (quoting O'Shea v. Twp. of W. Milford, 410 N.J.

Super. 371, 382 (App. Div. 2009)).  "Those directives have the force of law because the Legislature has expressly provided 'the Attorney General[][] statutory power to adopt guidelines, directives, and policies that bind law enforcement throughout our State.'"  Ibid. (alteration in original) (quoting Paff v. Ocean County Prosecutor's Office, 235 N.J. 1, 20-21 (2018)).

Here, contrary to the ALJ's findings, the AG's Drug Testing policy became effective in April 2018 pursuant to Directive 2018-2.  As noted, Directive 2018-2 unambiguously states, "[t]his Directive shall take effect immediately upon issuance" and "[a]ll drug testing policies shall be adopted and/or revised in accordance with this Directive within [thirty] days."  Drug Testing policy therefore became effective, at the latest, thirty days after Directive 2018-2's March 20, 2018 issuance date, which is well before Griffin's August 2018 drug test.

Additionally, a plain reading of the "Urine Specimen Collection Procedures" included in the Drug Testing policy leads to the conclusion that HCDC violated the policy by failing to mandate Griffin provide a second urine sample.  Although the policy does not explicitly state two samples are required, the collection procedures consistently refer to two samples and specifically requires the monitor to "instruct[] the donor to void a specimen between 45 mL

17

and 60 mL <u>into each specimen container</u>." (emphasis added). The policy also unambiguously states, "[a] donor whose specimen tested positive may only challenge the positive test result by having the second specimen independently tested. The first specimen will not be retested."

HCDC's failure to require Griffin to provide a split sample for testing does not necessarily entitle Griffin to relief, however, contrary to her contentions. <u>See</u> <u>George v. City of Newark</u>, 384 N.J. Super. 232, 238-39 (App. Div. 2006); <u>see</u> <u>also</u> <u>O'Rourke v. City of Lambertville</u>, 405 N.J. Super. 8, 18-19 (App. Div. 2008) (noting a municipality's failure to comply with the Attorney General's Guidelines for investigating and discipling officers "[did] not rise to the level of a denial of plaintiff's constitutional rights to due process"). Rather, we must specifically determine whether HCDC's deviation from the Drug Testing policy violated Griffin's due process rights or rendered her urine sample "fundamentally flawed" such that it should be considered invalid. <u>Id.</u> at 239.

"To establish a violation of procedural due process, a plaintiff must show that the defendant deprived [her] of a protected property interest and that the local and state procedures for challenging the deprivation were inadequate." <u>Plemmons v. Blue Chip Ins. Servs., Inc.</u>, 387 N.J. Super. 551, 566 (App. Div. 2006). "In examining a procedural due process claim, we first assess whether a

liberty or property interest has been interfered with by the State, and second, whether the procedures attendant upon that deprivation are constitutionally sufficient." Doe v. Poritz, 142 N.J. 1, 99 (1995).

Additionally, "[t]o assert a claim for a deprivation of property without procedural due process, 'the claimant must either avail himself of the remedies provided by state law or prove that the available remedies are inadequate.'" Plemmons, 387 N.J. Super. at 566 (quoting Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 643 (1999)). "Consequently, '[a] state cannot be held to have violated due process requirements when it has made procedural protections available and the plaintiff has simply refused to avail himself of them.'" Id. at 567 (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).

In George, we recognized a police sergeant for the City of Newark had "a protected interest in his continued employment with the City" as well as "a right to have a split sample tested at the same threshold as the primary sample." 384 N.J. Super. at 238. In that case, the City of Newark removed the Sergeant from employment after conducting a random drug test pursuant to the AG's then-effective drug testing policies. Id. at 235. After the donor's first sample tested positive for marijuana, he requested his split sample be tested by an independent

laboratory.  Id. at 235-36.  The independent laboratory tested the split sample at the incorrect threshold, however, and reported the sample was negative for marijuana.  Id. at 236.  Although the ALJ affirmed the donor's dismissal, the Merit Systems Board reversed the initial decision, "concluded that it was the City's obligation to advise the independent lab of the proper threshold," and determined the City's failure to so advise the lab "rendered the testing process 'fundamentally flawed' and deprived [the donor] of his 'due process' opportunity to establish that the positive reading was false."  Id. at 237.

Notwithstanding our deferential review of agency action, "we question[ed] whether the record contain[ed] sufficient evidence supporting the Board's decision that a due process violation occurred and that the entire testing process was 'fundamentally flawed.'"  Id. at 238-39.  We did not find support in the record that the split sample results would have invalidated the testing of the primary sample and concluded the Board "mistakenly underestimated the weight of the test results in reaching its conclusion that the entire testing process was flawed."  Id. at 239-40.

We also observed "there were neither rules nor guidelines that placed the notification burden on the City at the time of [the donor]'s test," and he "was able to challenge several aspects of the State's lab test."  Id. at 240-41.  We also

20

rejected the Board's conclusion that relief was warranted because the donor was deprived of evidence to refute the initial test result. Id. at 241. On that point, we concluded the donor's situation was "analogous to the plight faced by criminal defendants when the State loses or otherwise damages or suppresses favorable evidence." Ibid.

We noted, in the absence of bad faith by the State, "relief should be granted only when there is a showing of manifest prejudice or harm arising from the failure to preserve evidence." Id. at 243 (quoting State v Dreher, 302 N.J. Super. 408, 489 (App. Div. 1997)). After rejecting the Board's conclusions as unsupported by substantial evidence in the record, we remanded for further consideration of whether "the City's failure constituted a due process violation and rendered the testing process 'fundamentally flawed.'" Id. at 245.

In an analogous context, we have held that an agency's failure to comply with guidelines promulgated by the AG, although insufficient to constitute a denial of procedural due process, may nevertheless require an employee be reinstated. See O'Rourke, 405 N.J. Super. at 18. In O'Rourke, the City adopted policies related to internal investigations pursuant to AG guidelines and N.J.S.A. 40A:14-181, which "'requires [e]very law enforcement' agency in this State to 'adopt and implement guidelines' that are 'consistent with the guidelines' that

have been promulgated by the [AG], through the Police Bureau in the Division of Criminal Justice." Id. at 19 (alteration in original) (quoting N.J.S.A. 40A:14-18.1). It then failed to abide by those policies when investigating the plaintiff's misconduct. Id. at 20-21.

We rejected the City's argument "that the deficiencies in the investigative process [were] trivial and were cured by the evidentiary hearing," concluding "[a] fair and objective investigation of the allegations is an essential part of the disciplinary process envisioned by the [AG]'s Guidelines and established by the City's rules." Id. at 21-22. We also observed the deviations from the guidelines in that case "undermined the fairness of the process at its inception and tainted the entire proceeding." Id. at 22. And although we rejected the plaintiff's due process argument, we nevertheless determined "when a law enforcement agency adopts rules pursuant to N.J.S.A. 40A:14-181 to implement the [AG]'s Guidelines, the agency has an obligation to comply with those rules." Id. at 23. Accordingly, we held "the City's decision to remove plaintiff from his position cannot stand." Ibid.

We are satisfied HCDC's technical deviations from the AG's Drug Testing policy did not deprive Griffin of her due process rights or render the testing process fundamentally flawed. See George, 384 N.J. Super. at 239. As noted,

22

the ALJ determined, based on the testimony adduced at the evidentiary hearing and her credibility findings, that Detective Diaz fully informed Griffin of her option to provide a second sample, she knew providing a second sample was her only avenue to challenge a positive test result, and she nevertheless refused to provide a split sample. The ALJ's conclusions were fully supported by the testimony of HCDC's witnesses, particularly Detective Diaz. Accordingly, Griffin failed to avail herself of the due process protections offered to her by HCDC, notwithstanding HCDC's technical failure to mandate she provide a second sample, and it therefore "cannot be held to have violated due process requirements." See Plemmons, 387 N.J. Super. at 567.

We are also satisfied the testing procedures were not "fundamentally flawed" such that the positive result should be invalidated. As noted, the ALJ found it was uncontested Griffin's sample tested positive for a "very high" level of benzoylecgonine, which was supported by Dr. Havier's testimony, in which he described the testing process and testified as to his confidence in the results. Notably, Griffin does not challenge the validity of the initial test results, the efficacy of the testing procedures as they relate to that sample, or the chain of custody of that sample. HCDC's deviations from the AG's Drug Testing policy

23

therefore did not "undermine[] the fairness of the process at its inception [or] taint[] the entire proceeding." See O'Rourke, 405 N.J. Super. at 22.

Further, to the extent Griffin was prejudiced by HCDC's deviation from the policy, see George, 384 N.J. Super. at 243, we are satisfied any prejudice was self-inflicted and resulted from Griffin's own refusal to submit a second sample. Indeed, the fact Griffin refused to provide a second sample after being informed of her right undermines her due process challenge and validates the urine collection process, notwithstanding HCDC's deviation from the collection procedures mandated with the AG's Drug Testing policy. In reaching this conclusion, we fully acknowledge the second sample is an integral feature of the specimen collection procedures, as it provides the sole avenue for challenging a positive test result, but conclude HCDC's deviation from the AG's Drug Testing policy does not require Griffin's reinstatement under the idiosyncratic circumstances presented here, which include: 1) the fact the validity of the positive test result is uncontested; 2) HCDC having informed Griffin she needed to complete a second sample in order to challenge a positive test result; 3) the ALJs finding she chose not to avail herself of that protection.

IV.

Finally, having determined Griffin's urine sample was valid, notwithstanding the HCDC's deviation from the Drug Testing policy, we reject Griffin's argument that the ALJ's decision was arbitrary, capricious, and unreasonable. In doing so, we fully acknowledge certain of the ALJ's findings cannot withstand scrutiny even under the panel's deferential standard of review. See e.g., Stallworth, 208 N.J. at 194. Specifically, it is clear the ALJ's analysis was animated in large part by her incorrect conclusion, contrary to the effective date implemented by Directive 2018-2, that the Drug Testing policy did not go into effect until September 2018. Further, she also erroneously concluded Griffin failed to avail herself of the opportunity to challenge the initial test results by having the first sample tested by an independent laboratory. The AG's Drug Testing policy clearly states, however, that a donor "may only challenge the positive test result by having the second specimen independently tested" and "[t]he first specimen will not be retested."

Notwithstanding those errors, the ALJ's determination that Griffin violated HCDC's drug policy was supported by substantial credible evidence in the record. See Carter, 191 N.J. at 483. Specifically, Dr. Havier testified Griffin's sample tested positive for a cocaine metabolite substantially over the

positive testing threshold.  As noted, there is no contention, nor any evidence in the record, that the first test was improperly collected or tested.  Additionally, the ALJ found Griffin's testimony that she never used illegal drugs self-interested and incredible.

V.

Griffin also argues the ALJ's determination was arbitrary, capricious, and unreasonable due to the "multitude of procedural errors and issues with the handling of this matter by the ALJ."  According to Griffin, the ALJ's erroneous procedural and evidentiary rulings "compound the due process violations which occurred, amount to further denial of due process, and require reversal of the" ALJ's initial decision and the CSC's final decision.  She specifically asserts the ALJ improperly:  (1) "denied [her] motion for summary decision"; (2) "held a non-existent privilege applied to communications with PBA local 109 President and [HCDC] administration"; (3) "excluded impeachment testimony and evidence"; (4) "failed to take judicial notice of AG Directive 2018-02"; (5) "refused to allow written closing submissions"; and (6) declined to recuse herself.  We are unpersuaded by any of these arguments, which we address seriatim.

A. Summary Decision

Griffin contends the ALJ erred in denying her summary decision application because "no material facts were in dispute" and she "was entitled to decision in her favor as a matter of law." She specifically argues it was undisputed that "the [AG] Guidelines . . . became effective in April 2018", the guidelines required HCDC to collect two urine samples, and, contrary to the guidelines, it took only one sample. Because HCDC failed to adhere to the guidelines, Griffin maintains she was unable to challenge the urine test results and was therefore entitled to judgment as a matter of law.

"Because an agency's summary decision is a legal determination, our review is de novo." L.A. v. Bd. of Educ. of City of Trenton, 221 N.J. 192, 204 (2015). The standard for granting summary decision is "substantially the same" as that governing a motion for summary judgment in a civil proceeding under Rule 4:46-2. Contini v. Bd. of Educ. of Newark, 286 N.J. Super. 106, 121 (App. Div. 1995). Thus, a summary decision is proper if the record demonstrates "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment . . . as a matter of law." Burnett v. Gloucester Cty. Bd. of Chosen Freeholders, 409 N.J. Super. 219, 228 (App. Div. 2009) (quoting R. 4:46-2(c)). We consider "whether the competent evidential materials presented,

when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

We are satisfied genuine issues of material fact precluded summary decision. See Burnett, 409 N.J. Super. at 228. Notably, at the time of her motion, Griffin had yet to testify with respect to the testing procedures and whether she refused to provide a second sample, as recalled by Detective Diaz. Additionally, even were the panel to accept there were no genuine issues of material fact at the time of her motion, Griffin was not entitled to judgment as a matter of law. As explained supra, HCDC's failure to mandate she provide a second sample, alone, did necessarily deprive her of her due process rights or invalidate the positive result. See George, 384 N.J. Super. at 239.

### B. Privilege and Impeachment Testimony

Griffin next argues the ALJ improperly excluded Corporal James' testimony with respect to his conversation with the HCDC director as privileged. According to Griffin, such conversations do not fall within any privilege provided for in the New Jersey Rules of Evidence and "testimony regarding those conversations is not protected, is relevant to the matter currently before

the [c]ourt, and was admissible." She further asserts the ALJ's exclusion of such evidence "materially prejudiced" her defense.

Griffin also argues the ALJ erroneously excluded evidence of emails she sought to introduce to impeach Dr. Havier's testimony. According to Griffin, her counsel's email exchanges with Dr. Havier "constituted trial preparations" that "were not required to be turned over or provided as any form of discovery." She similarly argues the statements contained in the emails "did not constitute evidence of prior inconsistent statements until Dr. Havier contradicted the answers he gave . . . during his testimony on September 25, 2019." We are unpersuaded.

In administrative proceedings, evidence rulings "shall be made to promote fundamental principles of fairness and justice and to aid in the ascertainment of truth." N.J.A.C. 1:1-15.1(b). Unless specifically provided otherwise in the Administrative Code, neither the common law of evidence, statutory evidence law, or the New Jersey Rules of Evidence are binding in administrative proceedings. N.J.S.A. 52:14B-10(a); N.J.A.C. 1:1-15.1(c).

However, "the fundamentals of fair and adequate procedure constituting due process must be observed, and cross-examination and rebuttal have been held to be basic elements of an administrative hearing essential to due process."

In re Application of Howard Sav. Bank, 143 N.J. Super. 1, 6-7 (App. Div. 1976).
All relevant evidence is admissible, except as otherwise provided in the Code, and an ALJ has discretion to exclude evidence if "its probative value is substantially outweighed by the risk its admission will either necessitate undue consumption of time or create substantial danger of undue prejudice or confusion." N.J.S.A. 52:14B-10(a); N.J.A.C. 1:1-15.1(c).

Administrative agencies have a great deal of discretion in many areas and exercises of discretion "are entitled to respectful review under an abuse of discretion standard." Serenity Contracting Group, Inc. v. Borough of Fort Lee, 306 N.J. Super. 151, 157 (App. Div. 1997). Such discretion includes that to limit or preclude any cross-examination deemed unnecessary to "a full and true disclosure of the facts." N.J.S.A. 52:14B-10(a); N.J.A.C. 1:1-15.1. A court abuses its discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration and Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

First, we are satisfied although Griffin argues the ALJ excluded evidence of Corporal James' conversation with the HCDC director as privileged, it is clear

30

from the record the ALJ excluded evidence of the conversation under N.J.R.E. 403(b). Indeed, she determined the evidence could prejudice HCDC in its ability to defend suits concerning the August 2018 testing and lacked probative value in the case. The ALJ was within her discretion to limit cross-examination as unnecessary. In any event, even were we to agree the ALJ abused her discretion, we are satisfied any error was harmless, see Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 2:10-2 (2023) (recognizing the applicability of Rule 2:10-2 in administrative appeals), as Griffin sought to introduce a conversation about HCDC's failure to use waivers at the August 2018 drug testing, which was already firmly established by Detective Diaz's testimony and accepted as fact by the ALJ.

We also find the ALJ did not abuse her discretion by refusing to admit evidence of emails Griffin's counsel received from Dr. Havier the night before he was scheduled to testify on cross-examination. As noted, Dr. Havier testified on July 19, 2019, and would have been subject to cross-examination on that day but for Griffin's counsel's scheduling errors. It is clear the ALJ determined HCDC would be prejudiced by counsel questioning Dr. Havier with documents obtained after his initial testimony and which Griffin failed to provide to opposing counsel in a timely manner.

31

C. Judicial Notice

Griffin also contends the ALJ's initial decision "must be reversed" because she failed to take judicial notice of Directive 2018-02. According to Griffin, judicial notice "became necessary as a result of Dr. Havier's testimony regarding the effective date of the New Jersey State Laboratory's policy," as his testimony contradicted the effective date imposed by Directive 2018-02.

HCDC contends a "fact[ual] dispute[] regarding the pertinent date of implementation of the AG Directive" precluded judicial notice. On this point, it notes "[b]oth Dr. Havier and Lt. Patterson testified that it was their understanding that, effective September 1, 2018, the State Laboratory would begin requiring two samples."

Under N.J.A.C. 1:1-15.2, "[o]fficial notice may be taken of judicially noticeable facts as explained in N.J.R.E. 201 of the New Jersey Rules of Evidence." Because Directive 2018-2 carries the force of law, it is judicially noticeable under N.J.R.E. 201(a). Under N.J.R.E. 201(d), "[t]he court shall take judicial notice if a party requests it on notice to all other parties and the court is supplied with the necessary information." We review a court's decision on a request to take judicial notice under the harmless error standard. See Est. of

32

Kotsovska ex rel. Kotsovska v. Liebman, 433 N.J. Super. 537, 550 (App. Div. 2013).

We agree the ALJ erred in failing to take official notice of Directive 2018-2 pursuant to N.J.R.E. 201(d). As noted, the ALJ incorrectly treated the implementation date as a factual question due to Dr. Havier's testimony the State laboratory did not begin mandating two urine samples until September 2018, despite the effective date mandated in the directive. Nevertheless, in light of our conclusion Griffin was not entitled to relief even considering the AG's Drug Testing policy as effective on the date of her urine test, we accordingly conclude the ALJ's failure to take judicial notice of Directive 2018-2 was harmless error.

D. Written Closing Submissions

Without citation to any legal authority, Griffin contends the ALJ's decision not to allow written closing submissions "undermine[d] the carriage of justice, prejudice[d] [Griffin], and requires reversal." In light of Griffin's failure to explain how the ALJ's failure to allow written closing submissions in any way prejudiced her, we conclude her argument is without merit.

E. Recusal

Finally, Griffin contends we should reverse the CSC's decision due to the ALJ's refusal to recuse herself. On this point, she argues only the following:

"[b]ecause of the [ALJ]'s conduct in this matter, [Griffin] was forced to request that the [ALJ] recuse herself. Said request was denied despite logical and cogent reasons to do so that is incorporated by reference herein." Again, we disagree.

"[R]ecusal motions are 'entrusted to the sound discretion of the judge and are subject to review for abuse of discretion.'" Goldfarb v. Solimine, 460 N.J. Super. 22, 30 (App. Div. 2019) (quoting State v. McCabe, 201 N.J. 34, 45 (2010)). Judges must act in a way that "promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Code of Jud. Conduct, r. 2.1. "[J]udges must avoid acting in a biased way or in a manner that may be perceived as partial." DeNike v. Cupo, 196 N.J. 502, 514 (2008). To determine if an appearance of impropriety exists, we ask "[w]ould a reasonable, fully informed person have doubts about the judge's impartiality?" Id. at 517; see also State v. Marshall, 148 N.J. 89, 279 (1997).

Judges must recuse themselves from "proceedings in which their impartiality or the appearance of their impartiality might reasonably be questioned," Code of Jud. Conduct, r. 3.17(B), or if "there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." R. 1:12-1(g). "A movant

need not show actual prejudice; 'potential bias' will suffice." Goldfarb, 460 N.J. Super. at 31. "The mere appearance of bias may require disqualification." Marshall, 148 N.J. at 279. However, "bias is not established by the fact that a litigant is disappointed in a court's ruling on an issue." Id. at 186. "[T]he belief that the proceedings were unfair must be objectively reasonable." Id. at 279.

We discern no abuse of discretion in the ALJ's denial of Griffin's recusal motion. Goldfarb, 460 N.J. Super. at 30. As noted, Griffin's counsel first asserted he was going to seek the ALJ's recusal after she excluded Dr. Havier's emails during the September 25, 2019 hearing. In his letter brief in support of the recusal application, Griffin's counsel referred to comments the ALJ made during the May 12, 2020 Zoom conference in which she summarized her reasoning for excluding those emails. It is clear from the record Griffin's recusal application was based merely on her counsel's disagreement with the ALJ's evidentiary ruling, see Marshall, 148 N.J. at 279, and we are therefore unpersuaded any "reasonable, fully informed person" would doubt the ALJ's impartiality. DeNike, 196 N.J. at 514.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0678-21